Board of Public Education *v.* Intille,
Appellant.

2

Argued January 8, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Franklin Poul* and *A. Harry Levitan,* for appellants.

*C. Brewster Rhoads,* with him *Edward B. Soken, Sidney L. Wickenhaver,* and *Montgomery, McCracken, Walker & Rhoads,* for appellee.

*Alan Reeve Hunt* and *Julian E. Goldberg,* for American Civil Liberties Union, under Rule 46.

OPINION BY MR. CHIEF JUSTICE JONES, June 30, 1960:

The three appellants (Angelina Intille, Thomas Deacon and Sadie T. Atkinson) were teachers in the public schools of Philadelphia until the Spring of 1954 when they were dismissed by the Board of Public Education of the School District on a charge of "incompetency", preferred by Dr. Louis P. Hoyer, Superintendent of the Philadelphia public schools. In each case, the dismissal was based *solely* on the teacher's refusal to answer certain questions propounded by a Sub-committee (also known as the Velde Committee) of the Un-American Activities Committee of the House of Representatives[1] concerning the witness' alleged membership in and association with the Communist Party.

[1] The term Committee wherever it appears in this opinion shall be taken to mean the above identified Sub-committee of the Un-American Activities Committee of the House of Representatives of the United States.

4

In refusing to testify in such regard, each of the appellants expressly relied upon the privilege against self-incrimination guaranteed by the Fifth Amendment of the Federal Constitution.

All of the proceedings below, which resulted in the final orders of dismissal, now before us, were conducted separately throughout but, since the basic legal questions raised (both Federal and State), are the same in all three appeals, they will be disposed of in this one opinion.

The appellants contend that their dismissals, as teachers, (1) violated the due process clause of the Fourteenth Amendment, and (2) abridged their privilege against self-incrimination under the Fifth Amendment in further violation of the Fourteenth Amendment and of Article VI of the Federal Constitution.

There is also an additional question raised by the Board's contention that the appellants' plea of privilege against self-incrimination under the Fifth Amendment constituted incompetency within the intent of Pennsylvania's Public School Code of 1949.

As teachers under contract prescribed by the Public School Code of 1949, the appellants were entitled to tenure as professional employees and, by virtue of the same statutory authority, were subject to dismissal from their teaching positions *only* for cause upon notice, hearing and right of appeal.[2] One of the specified causes for removal, as prescribed by the School Code, is incompetency, which is the charge upon which Superintendent Hoyer suspended these teachers and recommended their dismissal to the Board of Education.[3]

---

[2] See Sections 1121, 1122, 1127, 1131 and 1132, 24 PS §§11-1121, 11-1122, 11-1127, 11-1131 and 11-1132 of the Public School Code of 1949 (Act of March 10, 1949, P.L. 30, as amended).

[3] Section 1122 provides: "The only valid causes for termination of a contract heretofore or hereafter entered into with a professional employe shall be immorality, incompetency, intemperance, cruelty,

The Superintendent based his finding of incompetency solely upon the fact that the appellants had refused to answer questions asked them by the Congressional Committee in reliance on their pleas of privilege under the Fifth Amendment against self-incrimination.

Subsequent testimony by the Superintendent, as well as the Board's charges based upon his recommendations of dismissal, ascribed as the basis for the finding of incompetency that the appellants had, upon an allowed plea of privilege, failed to *cooperate* with the Committee when they appeared before it pursuant to subpoena. It is, of course, not possible to separate refusal to answer from exercise of the privilege. Obviously, it is the latter which affords the basis for the refusal to answer. Nor was there statute of this State nor rule promulgated by the Commonwealth's Department of Public Instruction or the Philadelphia Board of Education which assumed to deal in any way with a professional employee's invocation of the privilege against self-incrimination under the Fifth Amendment. That the refusal to answer on the ground of the plea was, in truth, the exclusive basis for the Superintendent's conclusion that the appellants were incompetent, should be plain to any one, even the most querulous.

Within *three* days of the appearance of Mrs. Intille and Mrs. Atkinson before the Committee, and their re-

persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employee: . . .". [Formerly, Section 1122 had also specified, as a cause for the termination of a teacher's contract, "advocation of or participating in un-American or subversive doctrines." This ground was expressly repealed, however, by Section 16 of the Pennsylvania Loyalty Act of December 22, 1951, P.L. 1726 (Pechan Act) which, in addition to prescribing a loyalty oath required of public employees, including teachers, specifies the grounds relating to loyalty for which their employment can be terminated.]

fusal to testify (*two* days in the case of Mr. Deacon), Superintendent Hoyer untertook to re-rate them as teachers and gave each a rating of "unsatisfactory" for the first time in the professional career of any one of them as a Philadelphia Public School Teacher.[4] In re-rating the appellants the Superintendent used an official rating card prepared and supplied by the State's Department of Public Instruction. Section 1123 of the School Code. The card contained a category of subjects according to which the qualifications of a teacher were to be judged. The Superintendent arrived at his conclusion that the appellants were incompetent by checking on the respective rating card for each of them three items listed, viz., (1) civic responsibility, (2) judgment, and (3) appreciation and ideals, in respect whereof the Superintendent then found each of them lacking because of their plea of the Fifth Amendment in refusing to answer some of the questions propounded by the Committee. In this way, the Superintendent, by equating the appellants' exercise of their constitutional privilege with poor judgment, deficiency of ideals and lack of civic responsibility, found them to be incompetent and forthwith suspended each of them and recommended their dismissal to the Board of Education *on the ground of incompetency.* At no time did any of the appellants refuse to answer any question asked them by their administrative superior.

The Board of Education, acting on the Superintendent's recommendations of dismissal, promptly charged each of the appellants with incompetency and fixed a separate time for a hearing thereon for each.[5]

---

[4] Mrs. Intille had been a teacher in the Philadelphia Public School system for six years, Mrs. Atkinson for ten and Mr. Deacon for upwards of twenty-four years.

[5] Mrs. Atkinson's hearing before the Board of Public Education on the charge of incompetency was held on April 9, 1954; Mrs. Intille's, on April 30, 1954; and Mr. Deacon's, on May 21, 1954.

Mrs. Atkinson, Mrs. Intille and Mr. Deacon attended their respective hearings before the Board. Counsel for the Board offered in evidence the respective transcripts of the hearing before the Committee at which the particular appellant had appeared and had refused to answer.[6] Dr. Hoyer testified at each of these hear-

---

[6] The transcript of the hearing before the Committee on November 17, 1953, at which Mrs. Atkinson appeared, disclosed that she had given the Committee her name, address and a resume of her schooling and her employment record as a teacher. When asked whether she had ever been a member of the Communist Party and whether she had a certain Communist membership book in 1945, she pleaded her privilege under the Fifth Amendment against self-incrimination and declined to answer.

The transcript of the hearing before the Committee on February 16, 1954, at which Mrs. Intille appeared, disclosed that she had given the Committee her name, address and a resume of her educational background and her employment record as a teacher. She testified under oath that in 1952 she had taken the Pennsylvania Loyalty Oath. (Note: As prescribed by the Act of December 22, 1951, P.L. 1726, 65 PS §211, etc., the oath disavows the affiant's advocacy of, or knowing membership in any organization that advocates, the violent overthrow of the government of the United States or of this Commonwealth, and forswears such advocacy, or knowing membership in any organization which so advocates, during his period of employment by the Commonwealth.) Mrs. Intille further testified that she was not a member of the Communist Party when she subscribed to the loyalty oath. When questioned by the Committee concerning certain other people, she offered to waive her constitutional right to plead the Fifth Amendment and asserted her willingness to answer any and all of the Committee's questions concerning herself if the Committee would agree not to interrogate her about anyone else. The Committee refused to so agree. Mrs. Intille thereupon elected to exercise her constitutional privilege under the Fifth Amendment and refused to answer any questions concerning her association with certain other people and whether she had ever been a member of the Communist Party.

The transcript of the hearing before the Committee on November 18, 1953, at which Thomas Deacon appeared, disclosed that he had given the committee his name, address, and a resume of his

ings before the Board as to his re-rating of the appellants, whereon he based his charge of incompetency which, in each instance, was bottomed on the teacher's refusal to answer questions of the Committee, as shown by the relevant transcript in evidence.

Neither Mrs. Atkinson nor Mrs. Intille were asked any questions by the Board or by the Superintendent at their hearings and did not testify; but Mrs. Intille, through counsel, offered to present evidence of her good reputation as a teacher and for civic responsibility and sound judgment. The offer was rejected by the Board and the evidence excluded "because the charge against her was based solely on her appearance before the Congressional Committee." (Board of Education's Brief, p. 8). Such was the extent of the Board's case upon which it dismissed Mrs. Atkinson and Mrs. Intille from their positions as teachers of the Philadelphia School District on May 10, 1954, and May 28, 1954, respectively. Each of them thereupon appealed the dismissal to the Superintendent of Public Instruction of the Commonwealth, as allowed by Section 1131 of the School Code.

Deacon, likewise, was not interrogated by the Board or by the Superintendent at his hearing on the charge of incompetency but voluntarily offered himself as a witness and testified "freely" and "fully" concerning the matters which the Committee had inquired about but which he had then refused to answer. He testified

---

education and employment as a teacher and as a counsellor at the Philadelphia Public Schools; that he had testified under oath that he was not a member of the Communist Party and that he had taken the Pennsylvania Loyalty Oath in April, 1952, and was not a member of the Communist Party at that time. He refused to answer any questions asked him by the Committee concerning whether he was a member of or had had affiliations with the Communist Party prior to 1952, electing to exercise his constitutional privilege under the Fifth Amendment.

that he had been a member of the Communist Party at one time but had been dropped from it prior to 1945 for non-payment of dues and non-attendance at meetings; that he had joined the Communist Party in late 1938 or early 1939 but had never taken any Party oath or signed any membership card or application; that he had been attracted to the Communist Party because he was interested in idealistic causes and that, at the time he joined, the Communist Party was one of a number of organizations which were opposing fascism, anti-Semitism and segregation and were promoting trade unionism, fair employment practices and other liberal causes in which he was interested; that he had attended some meetings in connection with these causes but had never held any office in the Communist Party or served on any of its committees; that he had never heard during his membership in the Communist Party any advocacy of the violent overthrow of the government and that, if he had heard such a thing, he would have left the Party immediately and would have reported the matter to the civil authorities. He reiterated his testimony before the Committee that he was not a member of the Communist Party in 1952 when he took the Pennsylvania Loyalty Oath and testified further that he had had no connection with the Communist Party whatever for a period of seven or eight years prior to that time and no longer had any affection or sympathy for it.

As a result of Deacon's hearing, the Board, on June 29, 1954, dismissed him as a teacher of the Philadelphia Public School District on the ground of incompetency. He forthwith appealed the order of dismissal to the Superintendent of Public Instruction of the Commonwealth. Section 1131 of the School Code.

On January 17, 1955, the Superintendent of Public Instruction dismissed all three appeals, viz., Mrs. At-

kinson's, Mrs. Intille's and Mr. Deacon's, and affirmed the action of the Board of Education in dismissing them as teachers of the Philadelphia Public School District on the ground of incompetency. Separate appeals were taken by the appellants from the respective orders of the Superintendent of Public Instruction to the several courts of common pleas of Philadelphia County as authorized by Section 1132 of the School Code. The final orders of the courts below, sustaining the action of the Superintendent of Public Instruction, are the subjects of the present appeals to this court.

The three co-ordinate courts below each sustained the order of dismissal before it in the mistaken belief that the question involved was ruled adversely to the appellant's contention by this court's decision in *Board of Public Education School District of Philadelphia v. Beilan,* 386 Pa. 82, 125 A. 2d 327, aff'd 357 U. S. 399. The error in that conclusion is patent. What the Board of Education sought to accomplish in these cases goes far beyond anything that was either decided or implied by the opinion for this court in Beilan's case. His adjudged incompetency resided exclusively in the fact that he had refused to answer questions of his *administrative superior* (Superintendent Hoyer) concerning matters deemed to have bearing on his qualifications as a teacher in the public schools of Philadelphia, and not that he had refused to answer questions of a Congressional Committee. That such was the *ratio decidendi* in the *Beilan* case is not open to question. Speaking for this court, Mr. Justice CHIDSEY said, "The secretiveness [of Beilan] consisted of a deliberate and insubordinate refusal to answer the questions of *his administrative superior* in a vitally important matter pertaining to his fitness. *Such conduct* stamped him with *incompetence* as a professional employe in the public schools." (Emphasis supplied). And, the Supreme

Court of the United States, in affirming, recognized that such was, indeed, the rationale of this court's decision, saying in that regard,—"He [Beilan] did, however, undertake obligations of frankness, candor and cooperation in answering inquiries made of him by *his employing Board* examining into his fitness to serve it as a public school teacher." (Emphasis supplied). Neither in this court nor in the Supreme Court was the fact that Beilan had pleaded the Fifth Amendment before the Committee availed of as ground for the decision.

The appellee Board is well aware of the distinction between *Beilan* and the present cases. In the Board's brief on these appeals, it is stated (p. 16) that "The present cases differ from the Beilan case in that the teacher's refusal to answer questions occurred before a Congressional Committee rather than before his administrative superior." The Board also recognizes (Brief p. 16) that this court did not pass upon Beilan's refusal to answer the Congressional Committee as a ground for his dismissal and that ". . . the Beilan case in the Supreme Court of the United States did not involve a dismissal where there was a claim of privilege against self-incrimination . . .". (Brief p. 30.)

In the cases now before us, none of the appellants refused to answer any question propounded by Superintendent Hoyer or by the Board of Education touching his or her qualifications as a teacher or their conduct as citizens or in any other capacity. As already stated, neither Mrs. Atkinson, Mrs. Intille nor Mr. Deacon was asked any questions by the Superintendent or by the Board except when Deacon, having voluntarily offered himself as a witness at his hearing before the Board, "answered every question which he was asked" and "freely", as the brief for the Board of Education concedes (pp. 40 and 41).

It stands out too clearly for any misunderstanding that the *only* thing for which the appellants were dismissed by the Board was that they had refused to answer certain questions of a Congressional Committee upon a proper plea of privilege against self-incrimination under the Fifth Amendment. This, the brief for the Board of Education acknowledges where it states (p. 3), "The charges were based on the refusal of the appellants to answer questions concerning their alleged membership in and association with the Communist Party under a plea of the privilege of the Fifth Amendment of the Federal Constitution during appearances before the Committee on Un-American Activities of the House of Representatives, Congress of the United States." Confirmation of the real basis for the charges is to be found in the Board's rejection of Mrs. Intille's offer of proof of her good reputation "because the charge against her was based solely on her appearance before the Congressional Committee" and the Board's further acknowledgment (Brief p. 41), that "The charge against Deacon was that he refused to answer the [Un-American Activities] Committee, and [that] this was the incompetency", viz., the incompetency for which he was dismissed as a teacher.

That the action of the Board in dismissing the appellants, as teachers with tenure, upon the asserted ground of incompetency was a penalty inflicted upon them by State action for having invoked, in a strictly federal proceeding, the privilege against self-incrimination under the Fifth Amendment, is too plain to be obscured by attenuated reasoning. Such being the unmistakable legal situation revealed by each of these appeals, application of the principle recognized by the Supreme Court in *Slochower v. Board of Higher Education of New York City*, 350 U. S. 551, is manifestly indicated.

Slochower, an associate professor in a college operated by the City of New York, was summarily discharged because, while testifying before the Internal Security Sub-committee of the United States Senate, he refused to answer questions concerning his alleged membership in the Communist Party in years past on a plea of privilege against self-incrimination under the Fifth Amendment. The particular Section of the New York City Charter under which Professor Slochower was discharged provided that, whenever an employee of the City makes use of the privilege against self-incrimination to refuse answering a question relating to his official conduct, "his term or tenure of office or employment shall terminate and such office or employment shall be vacant . . ." etc. Slochower was entitled to tenure under New York's Education Law and could be discharged only for cause after notice and hearing with right of appeal. The Supreme Court held that his summary dismissal as a teacher denied him due process in violation of the Fourteenth Amendment and, accordingly, reversed his discharge.

Counsel for the appellee in the cases now before us argues that all that the *Slochower* case decided was that he had been denied procedural due process. But, that was not all that the *Slochower* case adjudicated, as we read it. True enough, his summary dismissal without notice and hearing denied him procedural rights protected by the due process requirement of the Fourteenth Amendment; and it is also true that the Supreme Court's judgment of reversal remanded the case "for further proceedings not inconsistent with this opinion." It is clear, however, that the open order of remand was required in the circumstances. The Supreme Court recognized that "The State has broad powers in the selection and discharge of its employees and it may be that proper inquiry would show Sloc-

hower's continued employment to be inconsistent with a real interest of the State." Necessarily, therefore, what might subsequently be developed at a proper hearing was not to be foreclosed by the attendant order reversing Slochower's dismissal, not only because of the manner in which, but also the reason for which his discharge had been effected. The *Slochower* case decided that "to discharge an employee merely because he relied upon the Fifth Amendment plea of self-incrimination to avoid answering questions which he would be otherwise required to answer" constituted a denial of substantive due process. Such was, indeed, the appraisal of the dissenting justices as to the intended scope and effect of the majority's holding in the *Slochower* case (see p. 561 of 350 U. S.). And, that is what we take to have been the ruling in *Slochower* on the merits of the ground assigned by the Board for summarily dismissing him.

In speaking for the majority in the *Slochower* case, Mr. Justice CLARK, after condemning "the practice of imputing a sinister meaning to the exercise of a person's constitutional right under the Fifth Amendment" and, after recognizing that "The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury", declared (p. 559) that, ". . . the Board seized upon [Slochower's] claim of privilege before the federal committee and converted it through the use of §903 [of the New York City Charter] into a conclusive presumption of guilt", and then concluded by holding that "Since no inference of guilt was possible from the claim before the federal committee, the discharge falls of its own weight as wholly without support. There has not been the 'protection of the individual against arbitrary action' which Mr. Justice CARDOZO charac-

terized as the very essence of due process. Ohio Bell Telephone Co. v. Commission, 301 U. S. 292, 302."

Counsel for the Board urges upon us that, unlike in *Slochower,* here the condemned teachers were given hearings. The distinction is plainly immaterial. Hearing or no hearing, the dismissals in the instant cases were for the same invalid reason for which Slochower had been discharged, namely, the refusal to answer upon a plea of privilege under the Fifth Amendment before the Congressional Committee. Incidentally, the hearings given the appellants did not meet the basic requirements of procedural due process; they were not "full" hearings. But, we make no point of that presently except to note, in passing, that the Board's evident anxiety to keep from appearing to be finding the appellants guilty of disloyalty by inference, drawn from their refusal to answer the Congressional Committee's questions, had so submerged the alleged deficiency, with which the appellants were actually charged (and for which they were dismissed), viz., incompetency, that the Board failed to realize at Mrs. Intille's hearing that the proof she offered, which was rejected as irrelevant, had a direct bearing on the question of her competency. Also, counsel for the Board objected at Deacon's hearing to the reception of *any* testimony from him, including even an explanation of how he had come to join the Communist Party at an earlier time. The Board, however, overruled the objection and permitted Deacon to testify.

Deacon might as well have not volunteered his unrestrained revelation of his buried aberration of the past. Although he expressed regret and contrition for his earlier Communist Party association, and notwithstanding his background of twenty-four years of continuous "satisfactory" teaching service in the Philadelphia Public Schools, he was dismissed although this

court's manifest intendment in the *Beilan* case (p. 95), was that a *locus penitentiae* must be recognized and honored "where a teacher has been dismissed who has entirely discarded past subversive affiliations and has abided by a loyalty oath taken in good faith." Not one word of evidence, oral or documentary, was introduced at the Board hearing to controvert Deacon's testimony that he had discarded past subversive affiliations some nine or ten years before and had abided in good faith the obligations of the loyalty oath which he took in 1952.

It is our opinion that the cases before us are squarely ruled in the appellants' favor by the Supreme Court's decision in the *Slochower* case and that, consequently, the orders of dismissal, which were based solely on the appellants' refusal to answer upon a plea of privilege against self-incrimination under the Fifth Amendment before a Congressional Committee must be reversed as constituting State action denying them the due process guaranteed by the Fourteenth Amendment.

The Board argues that *Slochower* is distinguishable from the cases before us, citing as illustrative of the suggested distinction the reasoning of the California District Court of Appeals in *Nelson v. County of Los Angeles*, 163 Cal. App. 2d 607, 329 P. 2d 978, and *Globe v. County of Los Angeles*, 163 Cal. App. 2d 595, 329 P. 2d 971. Nelson was a permanent social worker employed by the County's Department of Charities, while Globe was a temporary employee of the same department. Both were subpoenaed to and did appear before a Sub-committee of the House Un-American Activities Committee but refused to answer certain questions asked them concerning subversion. They had been ordered by the County Board of Supervisors to answer any questions asked by the Sub-committee, relating to subversive activity, pursuant to §1028.1 of the Cali-

fornia Code which made it the duty of any public employee to give testimony relating to any such activity on pain of discharge "in the manner provided by law." The County discharged both of them on the ground of insubordination and violation of §1028.1 of the Code. Nelson, who had tenure, requested and was given a hearing before the Civil Service Commission, the result of which was the confirmation of his discharge. Globe was denied a hearing because, as a temporary employee, he was not entitled to one under the Civil Service rules, which he did not dispute. On appeal the discharges were affirmed by the California District Court of Appeal, as above cited. Both Nelson and Globe petitioned the Supreme Court for certiorari which was granted: 360 U. S. 928. In the Supreme Court, each contended that his discharge was based upon his invocation before the Sub-committee of his constitutional rights under the First and Fifth Amendments. A judgment of affirmance was entered by the Supreme Court on February 29, 1960, in Nelson's case by an evenly divided court without discussion. At the same time, the Supreme Court handed down a five to three decision affirming Globe's discharge, 362 U. S. 1.

We do not consider the decision in the *Globe* case to be controlling here. Several distinctions are to be noted which may have been persuasive with the majority in the *Globe* decision. For example, Globe, as a temporary employee without tenure, was dischargeable for any reason at any time, and without notice or hearing. His letter of dismissal ascribed his discharge to insubordination for failure to comply with a specific order. In answering Globe's contention that his discharge was based on his invocation before the Committee of his constitutional privileges, Mr. Justice CLARK, speaking for the majority said, "But the record does not support even an inference in this regard, and

both the order and the statute upon which the discharge was based avoided it." Also, the court expressly distinguished *Globe* from *Slochower* on the specific ground that California had made a "choice of securing such information by means of testimony before a federal body." No such choice has ever been, nor could be, claimed under Pennsylvania's Public School Code. The " 'built-in' inference of guilt, derived solely from a Fifth Amendment claim", which the Supreme Court said in *Globe* was present in the New York statute in *Slochower,* is exactly what the Board of Education sought to "build-in" in the present cases without the activation of statute.

We conclude, therefore, that the dismissal of the appellant teachers by the Board of Education for having refused to testify in a Congressional hearing, on a plea of the privilege against self-incrimination under the Fifth Amendment, denied them due process contrary to the Fourteenth Amendment of the Constitution of the United States.

We are also of opinion that the appellants' dismissals, as teachers, because they refused to answer certain of the Committee's questions on a plea of the Fifth Amendment's protection against self-incrimination, constituted an abridgment by State action of a privilege of the appellants' National citizenship available to them in a Federal proceeding. In so saying, we are, of course, not unmindful that the Supreme Court has directly ruled that some of the privileges guaranteed the individual citizen by the Bill of Rights are not protected inviolate by the Fourteenth Amendment against State action. Specifically, the privilege under the Fifth Amendment not to be compelled to incriminate one's self does not preclude a State from compelling self-incriminatory testimony in State trials:

*Adamson v. California,* 332 U. S. 46, 50-51; *Twining v. New Jersey,* 211 U.S. 78, 111, 112; cf. *Palko v. Connecticut,* 302 U. S. 319, 323-324.

The *Twining* and *Adamson* cases, supra, were concerned with State rules (New Jersey and California, respectively) which permit the prosecuting attorney and the judge in criminal trials to comment upon, and the jury to consider, the failure of the accused to testify in denial of incriminating evidence introduced against him. Twining and Adamson severally contended that the State rules constituted an abridgment of their privilege against self-incrimination under the Fifth Amendment. The Supreme Court rejected the contention, saying in the *Adamson* case (which was an avowed re-affirmation of the conclusion in the *Twining* and *Palko* cases), "It is settled law that the clause of the Fifth Amendment, protecting a person against being compelled to be a witness against himself, is not made effective by the Fourteenth Amendment as a protection against state action on the ground that freedom from testimonial compulsion is a right of national citizenship, or because it is a personal privilege or immunity secured by the Federal Constitution as one of the rights of man that are listed in the Bill of Rights." (pp. 50-51).

The *Palko* case involved a procedure under a Connecticut statute which allows an appeal in criminal cases by the State's Attorney, with permission of the trial judge, on questions of law. If the judgment is reversed on the State's appeal, a retrial of the accused on the same indictment may be had with the possibility of a verdict against him for even a higher degree of guilt than was found at the prior trial. Palko contended that the State procedure abridged his privilege against double jeopardy under the Fifth Amendment. This contention was likewise rejected by the Supreme

Court.[7] In the opinion for the court, Mr. Justice CAR-DOZO noted with contextually evident approval that "This court has said that, in prosecutions by a state, the exemption [i.e., against self-incrimination] will fail if the state elects to end it", citing *Twining v. New Jersey,* supra.

It is clear from the foregoing that the privilege against self-incrimination under the Fifth Amendment, which is an attribute of National citizenship, is not protected by the Fourteenth Amendment against State action for local uses and purposes incident to State citizenship (both National and State citizenship being recognized by the Fourteenth Amendment as coexisting in the same person). Consequently, while the State may restrict the privilege against self-incrimination in State actions without violating the Fourteenth Amendment, it may not, as was done in the cases now before us, impose a penalty upon a citizen's pleading in a Federal proceeding his privilege against self-incrimination under the Fifth Amendment. To hold otherwise would be to render the Constitution of the United States less than "the supreme Law of the Land" which Article VI declares it to be, and would allow a State to do what the United States itself cannot constitutionally do, namely, nullify the privileges of the Bill of Rights in Federal proceedings. As is well known, the rights conferred by Articles I to VIII, inclusive, which embrace what is popularly known as the Bill of Rights, were originally effective against the Federal government alone. The fact that some of such privileges and im-

---

[7] Palko was convicted of murder in the second degree at his first trial. On the State's appeal, the judgment of sentence was reversed and the accused was found guilty of murder in the first degree, with sentence of death, at his re-trial, which was affirmed by Connecticut's Supreme Court of Errors and by the Supreme Court of the United States.

munities have since been made effective against the States also, "by absorption" through the Fourteenth Amendment, in no way lessens or impairs the enduring effectiveness against the Federal government of the privileges and immunities of the Bill of Rights. The *Adamson* opinion so recognized where it observed (p. 53) that the Fourteenth Amendment left ". . . to the states the responsibility of dealing with the privileges and immunities of their citizens *except those inherent in national citizenship.*" (Emphasis supplied). What could be more inherent in National citizenship than the right to plead the Fifth Amendment against self-incrimination in a Federal proceeding?

It follows from what we have said that the appellants' dismissals by the Board of Education, because they refused to answer certain questions of the Congressional Committee on a plea of the Fifth Amendment's protection against self-incrimination, deprived them of liberty and property without due process of law and, at the same time, worked abridgment by State action of the same constitutional privilege, all in violation of the Fourteenth Amendment.

One further matter calls for consideration.

For a public school teacher to plead a constitutional privilege, in appropriate circumstances, does not prove the teacher's incompetency within the intended scope of that term as used in our Public School Code; the plea is not even relevant as evidence of incompetency. Just as remaining mute, upon a plea of the Fifth Amendment, carries no implication of guilt of the matter inquired about in the unanswered questions (see *Slochower v. Board of Higher Education of New York City,* supra) so also does the plea not carry an implication of the pleader's *incompetency.* Nor is it of any materiality to a question of the pleader's competency whether or not the propriety of the plea against

self-incrimination is conceded or rejected by the inquiring body so long as the plea is made in good faith and is not plainly frivolous. There is no prerequisite to the exercise of the privilege against self-incrimination that the pleader must first establish affirmatively his good faith and lack of frivolity in entering the plea. The appellants' pleas of the Fifth Amendment did not prove their incompetency within the meaning of the Public School Code and, since their refusal to answer the Committee's questions, in reliance on the Fifth Amendment privilege, was all that was proven against them, the Board failed to make out a case for their dismissal.

But, the Board presently advances the idea that a teacher who refuses to answer a Congressional Committee's questions, implying possible subversive affiliations on the part of the witness, is incompetent within the meaning of the tenure provisions of our Public School Code. Such a contention transgresses what was thought to have been decided in *Beilan,* where we were assured that no question of loyalty was in any way involved.[8] If the refusal to answer a particular question is to be made a basis for the discharge of a professional employee, the question should, obviously, have for its purpose the eliciting of information concerning some matter material to the fitness of the employee to continue at work. This is so whether the question propounded be by a Congressional Committee or by the Board of Education itself. And, if the only material

---

[8] See dissenting opinion of our brother BELL in *Beilan* where he said, pp. 110-111, "We cannot shut our eyes to the inescapable fact which we are convinced—notwithstanding the earnest, able argument of counsel for the Board—is glaringly disclosed by this Record, that Beilan was fired because the Board believed that he was a Communist." See also dissenting opinion in *Beilan,* of the writer of the present opinion at the bottom of p. 105.

matter to which the question relates is possible disloyalty or subversion on the part of the employee, then any proceeding looking to his dismissal for refusal to answer questions relating to his possible disloyal or subversive activities or affiliations must be brought under the Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726, 65 PS §211 et seq. In a proceeding under that statute a teacher may be discharged if it is determined "by a fair preponderance of the evidence" that he is a disloyal or subversive person; and "If the appointing authority shall be comprised of three or more members, a vote of two-thirds of the members shall be necessary in order to discharge a person." See Section 7 of the Act (65 PS §217). What the Board of Education has attempted to do in these cases is to avoid the requirement of the Pennsylvania Loyalty Act that disloyalty or subversion, as a ground for the discharge of a public school teacher, must be proven "by a fair preponderance of the evidence." The Board's action evidences a belief that it has found a way to dismiss, without any evidence at all, teachers whom it suspects of disloyalty or subversion. Anything in the *Beilan* case to the contrary is herewith overruled for the future. In searching out and eliminating disloyalty or subversion among teachers in public schools the procedures of the applicable statute enacted for that purpose must be faithfully pursued, and violence must no longer be done the meaning of the word "incompetency" in order to circumvent the procedures of the Loyalty Act.

The orders of the courts below, now here on appeal at Numbers 331, 332 and 352, are severally reversed, and the records remanded for further proceedings not inconsistent with this opinion.

Mr. Justice BELL and Mr. Justice EAGEN concur in the result.

24

CONCURRING OPINION BY MR. JUSTICE COHEN:

I am in thorough accord with the opinion for the Court. On at least ten occasions during oral argument the author of the lengthy dissent attempted to discolor these proceedings by advancing the same thoughts he has now expressed in writing and, upon each occasion, counsel for the School Board, when questioned, frankly and clearly affirmed that the loyalty of the school teachers was not in issue. It should be apparent to the least open-minded that the only legal problem with which we are concerned and the only question briefed and orally argued on these appeals is whether a public school teacher is "incompetent" if the sole evidence of his alleged incompetency is that he availed himself of the privileges of the Federal Constitution in a Federal proceeding. This has been answered most adequately by the opinion for the Court.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I dissent from the decision of the Court in this case because it imposes on the taxpayers of Pennsylvania an unwarranted burden to pay unearned wages to an ex-Communist who for six years was a dues-paying member of an organization committed to the overthrow of our government by force and violence, while at the time engaged in teaching children in the public schools of Philadelphia.

I dissent from the decision of the Court because it imposes an unjust burden on the taxpayers to pay unearned salaries to two school teachers who, accused of belonging to the Communist Party while teaching school, refused to answer whether they were or were not members of this organization committed to the overthrow of our government by force and violence.

I further dissent from the decision of the Court because it compels the School Board of Pennsylvania to re-employ these three school teachers who lost their jobs through their own incompetence, disloyalty and failure to abide by the simplest rules of honesty, fair dealing and cooperation with representatives of the United States Government and of the school authorities of Pennsylvania.

I also dissent because, by restoring jobs to three incompetent teachers, unworthy of public trust, three other able, loyal, competent trained school teachers are being denied needed employment.

The three school teachers whom the School Board of Philadelphia have been ordered to restore to employment are Thomas Deacon, Angelina Intille and Sadie T. Atkinson.

Thomas Deacon was a member of the Communist Party from 1939 to 1945. Mrs. Intille testified before the House Un-American Activities Committee that she was not a member of the Communist Party in 1952 when she signed the Pechan Loyalty oath of loyalty, but she refused to say whether she was a Communist the day before or a week before she signed the oath. She also refused to answer the question as to whether she was a Communist in 1932. She further declined to answer the question as to whether she was a Communist when she was given her permanent appointment as a school teacher. When she was asked whether she had sent any communication to the Communist Party resigning from the Party, she declined to answer "on the grounds of the Fifth Amendment."

When Representative Walter asked her if she was ever a member of the Communist Party, she countered with the question: "Will this Committee agree to ask me no further questions?" Obviously the Committee could not enter into any such crippling agreement and

Mrs. Intille's testimony ended on her refusal to say whether she had ever been a member of the Communist Party.

Mrs. Sadie T. Atkinson appeared before the House Committee on Un-American Activities on November 17, 1953. She was asked if she had ever been a member of the Communist Party and she declined to answer, pleading the Fifth Amendment. The following then ensued: "MR. KUNZIG: This committee has sworn testimony, Mrs. Atkinson, by witnesses before the committee, under oath, that you have been a member of the United People's Club of the Communist Party, is that correct? MRS. ATKINSON: I decline to answer on the same grounds. MR. KUNZIG: We also have sworn testimony that your Communist membership book in the year 1945 was Number 86905. Did you have such a Communist Party membership book? MRS. ATKINSON: I invoke the privileges of the Fifth Amendment on the same grounds."

Being a Communist in the United States carries with it such civic disabilities, social disadvantages, and personal opprobrium that it is inconceivable that anyone who is not a Communist would not deny being a Communist when asked the question, unless, of course he is mentally defective or is engaged in counter-espionage as a government agent, neither of which contingencies enter into the cases before us. Many court decisions have held that calling a non-Communist a Communist is slander or libel *per se,* depending on whether the statement is an oral or a written one. In the case of *Spanel v. Pegler,* 160 F. 2d 619, the United States Circuit Court of Appeals, 7th Circuit, said: ". . . in Illinois it is libelous per se to write of a man or a corporation that they are Communists or Communist sympathizers, because the label of 'Communist' today in the minds of many average and respectable persons

places the accused beyond the pale of respectability and makes him a symbol of public hatred."

A head note in the case of *Grant v. Reader's Digest Ass'n*, 151 F. 2nd 733, reads: "Under New York law, it is libelous to write of a lawyer that he has acted as agent of the Communist Party and is a believer in its aims and methods."

United States District Court Judge CONGER said in the case of *Remington v. Bentley*, 88 F. Supp. 166, 170, that: "I know of no accusation more discreditive of a United States Government official with respect to the proper conduct of his office than that he is a Communist."

Is such an accusation any less discreditive of a school teacher, and if the accusation is not true, why wouldn't the school teacher deny it?

In a case in our own Court, *McAndrew v. Scranton Republic. Pub. Co.*, 364 Pa. 504, the question arose as to whether it was libellous to attribute to a person the remark: " 'Of course, we all have to have a little Communism today.' " Chief Justice JONES, then Justice JONES, wrote in his dissenting opinion in that case that such a remark was "unquestionably defamatory." Revealing an exhaustive study of the subject, he wrote further: "As has been widely held, the meaning of such a remark is that the orator is a Communist or a Communist sympathizer. And, for the past twenty-five years in this country such a charge has generally been held to be defamatory. . . . Even the word 'Red', applied by a newspaper to a particular individual, was held to be defamatory as being reasonably understood to mean a person believing in disobedience to law and in favor of the appropriation by force and sabotage of the property of others: Toomey v. Jones, 254 P. 736, 124 Okla. 167; see also Annotation 51 A.L.R. p. 1071 et seq.

28

"The majority opinion seeks narrowly to dissipate the defamatory character of the Communist imputation by limiting the meaning of that term to people supporting the Russian government with which country this Nation had lately been an ally wherefore the term carried no publicly stigmatizing connotation. No such restricted sense of the term 'Communist' has come to my attention from any other jurisdiction in this country. On the contrary, in Mencher v. Chesley, supra, the Court of Appeals of New York, in treating in 1947 with a 1944 publication charging one with being a Communist, said that,—'Today and in the recent past—whether or not communism stands for violent overthrow of government . . . it is undeniable that for communism and its adherents and sympathizers, there has been wide spread public aversion. Evidence of that antipathy is found not only in public opinion polls and in other studies . . . . but also in legislation and executive orders enacted and promulgated during the past several years [prior to 1947] which subject communists and their affiliates and sympathizers to loss of public office and private position and, in some cases, even to deportation proceedings [citing authorities].' It was there also said that 'it is no answer [to a charge of libeling another by calling him a Communist] that communists may function as a recognized political party.' See Democracy and Defamation, 42 Col. Law Rev. 1282, 1304 (1942). In Spanel v. Pegler, supra, the charge of Communism there complained of was made in March of 1945 when we were actually (and not merely lately) an ally of Russia and the publication was nonetheless held to be defamatory."

There can be no question whatsoever, especially since the Korean War, when Communists killed 30,000 Americans, that the attributing of Communist Party membership to a non-Communist is a libel of a particu-

larly aggravated character. Who can doubt that there is no loyal American who would not bitterly resent being called a Communist, particularly since it is unquestioned knowledge that the Communists today (and in 1953-4 when these appellants were questioned) are responsible for the international tensions, hatreds, animosities and bellicosities which may at any time burst into a nuclear war which, of course, will mean the annihilation of most of the human race? I repeat, therefore, that it is utterly inconceivable for one who is not part of the international conspiracy to destroy democratic government in the United States to deny being a member of the Communist Party, if so accused, unless he is insane or of moronic intellect.

The three persons involved in this litigation are not of inferior intellect. Mrs. Atkinson is a graduate of the Philadelphia Normal School and Temple University. Mrs. Intille is a graduate of the Philadelphia Normal School. Deacon is a graduate of the Philadelphia Normal School and obtained bachelor's and master's degrees in counseling at the Temple University.

None of them can deny knowing that Communism is the major menace of our time, imperiling the very existence of Western civilization. None of them can possibly deny knowing that it is because of the international Communist Party, with its never-ending threat of exterminating war, that we are required to keep our nation on a continuous war footing, that American youth is constantly on call for war service, that the American people are almost being bled white with taxation in order to maintain the crushingly burdensome war machine, that, despite repeated and never-relenting efforts on the part of the United States, to bring about disarmament with inspection, international Communism refuses to agree, and that the international Communist Party is responsible for riots, revolutions, and continuous agitation in all parts of the world.

The three appellants in this case know that the Communist Party in the United States is merely a part of the international Communist Party, with directing headquarters in Moscow, and that every member of the Party is committed to the Party line. The three appellants in this case know, as said by J. Edgar Hoover, Director of the Federal Bureau of Investigation, that: "To make the United States a communist nation is the ambition of every Party member, regardless of position or rank. He works constantly to make this dream a reality, to steal your rights, liberties, and property. Even though he lives in the United States, he is a supporter of a foreign power, espousing an alien line of thought. He is a conspirator against his country."*

William Z. Foster, long-time head of the communist movement in the United States, has pictured a Soviet America with the liquidation of all particular parties, "the Communist party functioning alone as the Party of the toiling masses. Likewise, will be dissolved all other organizations that are political props of the bourgeois rule, including chambers of commerce, employers' association, rotary clubs, American Legion, Y.M.C.A., and such fraternal orders as the Masons, Odd Fellows, Elks, Knights of Columbus, etc."

Director Hoover describes further what could and would be expected in a Soviet America: "The press would be muzzled, free speech forbidden, and complete conformity demanded. If you expressed an opinion contrary to the Party line, you should have known better and your 'disappearance' would serve as a lesson for others. Fear becomes an enforcement technique." (Masters of Deceit, p. 8)

The three school teachers in this case cannot profess ignorance of the atheistic character of Communism,

---

* Masters of Deceit, Hoover, Henry Holt, 1958.

and that Foster warns that when the Soviets take over in America, "God will be banished from the laboratories as well as from the schools."

Nor can they fail, as educated people, to be acquainted with Lenin's repudiation of moral precepts: "We repudiate all morality that is taken outside of human, class concepts . . . We say that our morality is entirely subordinated to the interests of the class struggle."

If Deacon, Intille and Atkinson did not subscribe to these completely unAmerican precepts, why didn't they denounce the Communist Party program when asked, by representatives of the United States Congress, about their association with the Communist Party? Can adherence to the Communist Party program be reconciled with the moral behavior expected of American school teachers? And if Deacon, Intille and Atkinson have such a feeling and conviction about the Communist Party that they refuse to be identified with those who oppose the Communist international conspiracy, why should the taxpayers of Pennsylvania be compelled to pay them salaries for the time that they were idle as the result of their hostile conduct before representatives of the American people?

I have offered some quotations on the meaning and purpose of the Communist Party because the Majority ignores the subject entirely in its Opinion. In order to have a thorough understanding of the issues involved in this litigation it is necessary to be reminded what the Communist Party is.

The appellants here were asked if they formed part of an organization whose objectives have authoritatively been spelled out by Congress as presenting a clear and present danger to our country: "The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods

in other countries, and the nature and control of the world Communist movement itself, *presents a clear and present danger to the security of the United States and to the existence of free American institutions.*"* (50 U.S.C.A. p. 444)

One might gather from reading the Majority Opinion that the organization about which the appellants were questioned is some innocuous debating society or some interdicted fishing club. In point of sobering and frightening fact, the school teachers here involved were asked what association they had with the most evil, traitorous, treacherous, murderous organization that ever disgraced past and current history's pages. One of them refused before the House Un-American Activities Committee to discuss his Communist Party affiliation but admitted to the School Board later that he had been a Communist for six years. Another of the appellants refused to deny membership, and the third blandly remained mute when advised of sworn testimony of a Communist membership book issued in her name. Not one denounced the Communist Party whose goal was described by Justice JACKSON of the Supreme Court of the United States in the following cogent language: "The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate . . . Violent and undemocratic means are the calculated and indispensable methods to attain the Communist Party's goal . . . In not one of the countries it now dominates was the Communist Party chosen by a free or contestable election; in not one can it be evicted by any election. The international police state has crept over Eastern Europe by deception, coercion, coup d'état, terrorism and assassination. . . . The Amer-

---

* Italics throughout, mine.

ican Communist Party has copied the organizational structure and its leaders have been schooled in the same technique and by the same tutors." (*American Communications Ass'n v. Douds*, 339 U. S. 382, 425-429.)

Justice JACKSON said further that "There is certainly sufficient evidence that *all members* owe allegiance to every detail of the Communist Party program and have assumed a duty actively to help execute it."

Deacon has admitted allegiance to the Communist Party so that as a member of it, he helped to further the revolutionary aims of the Party—while teaching school children in Philadelphia. Intille and Atkinson knew of the aims of the Communist Party, they knew that to be charged with membership in it was to be charged with participating in its nefarious plotting for revolution, bloodshed and supremacy of the dictatorship of the proletariat. Then, if they had not been members why did they not deny that membership? Is that the type of person who should be teaching the school children of Pennsylvania?

In the whole twenty pages of the Majority Opinion there is not one word of criticism of the conduct of these three teachers who certainly did not comport themselves as ideal tutors of youth. In fact, there is in the Majority Opinion even a spirited defense of Thomas Deacon who admits that from 1938 or 1939 until 1944 or 1945, he was a member of the Communist Party and paid dues. Incidentally, these dues were proportioned to his salary so that the taxpayers were, in effect, paying Deacon's dues to an organization committed to destroying the American schools. During the years Deacon was an active member of the Communist Party he attended their meetings and, on occasion held Communist meetings in his own home.

Before the House Un-American Activities Committee Deacon refused to speak of his Communist ac-

tivities, but within the privacy of the hearing before the School Board he attempted to explain why it was that he categorically declined to answer the questions put to him by members of Congress. He said for one thing that if he told about the Communist meetings he attended he would have visited harm upon others. When asked to explain this remark he replied: "I mean the Velde committee could make at least a thousand people in this school system either go to jail on contempt, perjury, or through the Fifth Amendment, if they answered truthfully. At least a thousand."

This patent absurdity was equalled by many other grotesque statements such as the one that during his entire six years' membership in the Communist Party he never heard any advocacy of violent overthrow of the government. The Majority accepts Deacon's statement without a grain of incredulity.

Deacon's statement is an insult to intelligence. Every Communist member is required to study the literature of the Party, which is one continuing litany of appeal to violence. Director J. Edgar Hoover states in his book that a Communist Party directive specifically warns: "Every Communist must read and study the classics of our literature, past and present. Everyone must rigorously enforce the slogan, "One night a week for Marxist study."*

Hoover explains that this "means daily readings in the communist bible—the works of Marx, Engels and Lenin," and that "this communist education, like all phases of the Party's program, is geared to *revolutionary action.*"**

The *Communist Manifesto*, which is the very primer of Communist education, and which every Communist must know practically by heart, flatly and unabashed-

* Masters of Deceit, 162.
**Ibid, 163.

ly declares: "The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained *only by the forcible overthrow of all existing social conditions.*"

Lenin's masterpiece, *State* and *Revolution*, next in importance only to the *Communist Manifesto*, puts the proposition quite clearly when it says that "The replacement of the bourgeoisie by the proletariat state is impossible without a violent revolution." What does Lenin mean by revolution? He leaves no one in doubt: "Revolution is undoubtedly the most authoritative thing possible. It is an act in which one section of the population imposes its will on the other by means of rifles, bayonets, cannon, i.e., by highly authoritative means, and the victorious party is inevitably forced to maintain its supremacy by means of that fear which its arms inspire in the reactionaries."

The Majority seeks to palliate the enormity of Deacon's disloyalty for six years (because membership in the Communist Party cannot be regarded otherwise, by referring to it as a "buried aberration of the past"). The Majority pleads *locus penitentiae* in his behalf and cannot understand why the Board of Education would want to dismiss a school teacher who has broken with his evil past. I suppose that practically every murderer regrets having killed his victim, especially when he is caught. I don't doubt that every robber regrets having clubbed an innocent passerby and taken his money, especially when he is brought into court for sentencing. It can be assumed that when a person betrays his country and his eyes awaken to the monstrousness of what he has done, he may be sorry. It is said that Benedict Arnold in his old age bitterly regretted having bartered the cause of American liberty for English pounds, but that did not restore to him the glorious uniform he wore at Saratoga.

Should the school children of Philadelphia have to take as a mentor a man who had such little regard for the welfare of his country that for six years he paid out money to advance the program of an organization which had and has but one main objective, and that is to turn the United States into an atheistic Soviet Satellite?

I have said that the Majority has taken Deacon's testimony without a grain of salt. It has gone further. It has taken it and seasoned it with fantasy. The Majority says that Deacon "expressed regret and contrition for his earlier Communist Party association." There is not one word in the entire record which shows any regret or contrition on his part for participating in the Communist conspiracy for six years. He did answer in the affirmative some very leading questions to the effect that he no longer had any affection or leaning for the Communist Party but he never offered one word of criticism of the Party or its aims or its treasonable objectives. I studied minutely the 45 pages of his testimony hoping to come upon some breast-beating of contrition which the Majority imaginatively ascribes to him, but I found not a word of sorrow for having turned his back for six years on the ideals of the United States while receiving the toil-stained dollars of her working taxpayers.

He left the Communist Party not out of principle, not because he found anything wrong in what Lenin, Stalin and Khrushchev advocated, not because it was Russia's evil alliance with Hitler which precipitated the catastrophic World War II, not because Moscow's clear intentions are to destroy democratic government throughout the world, and particularly in America. No, he did not leave the Communist Party for any of these reasons. He left only because of "inertia."

He was asked specifically: "Mr. Deacon, will you tell us exactly why you got out of the Communist party? Why did you leave it?" His answer was: "I would say social inertia, and something that took its place. My daughter, for the past five years, which is a terrifically important thing to me, a personal thing." He added another reason: age. His words: "Age. That is what it is. I am forty-seven years old. I am a little different than I was ten years ago."

But he is not so different that he gave up membership in the Teachers Union which was expelled from both the A.F. of L. and the C.I.O. because it was Communist-dominated. Nor did he break with the Communist Party completely when he supposedly left it. His wife remained as a member of the Communist Party for another year and a half.

And this is the man for whom the Majority takes up cudgels and seeks to portray as a very much abused citizen, for whose treatment the School Board should practically apologize and the taxpayers should be glad to pay over to him a salary he did not earn, a salary made up of dollars which carry the sacred motto: "In God We Trust," a motto which for at least six years Deacon ignored and reviled as a member of the anti-God, atheistic Communist Party.

In an opinion that is unusually sharp and severe the Majority castigates the Philadelphia Superintendent of Schools for having rated Deacon "unsatisfactory" when for the previous 24 years he had drawn a rating of "satisfactory." This is not an unheard of phenomenon in life. Until the arsonist burns down his first house, even the fire insurance writer may rate him as a satisfactory citizen. Not every incendiary is found out before he accomplishes his first big conflagration. The school authorities did not know that while Deacon was supposedly teaching the children of Philadelphia the

principles of good American citizenship he was meeting with agents of a hostile ideology who were planning and plotting to replace the Stars and Stripes with the hammer and sickle over every schoolhouse in America—and so Deacon got his rating of "satisfactory" year after year.

The Majority has not a word of commendation for the earnest efforts of the School Board of Philadelphia dedicated as it is to the highest ideals of education, doing their work without compensation and interested only in seeing that every schoolhouse is indeed a citadel of American freedom. And so the Majority finds fault with everything the School Board has done in this case and even visits stern censure on the Superintendent for having re-rated Deacon two days after he refused to answer questions put to him by the Congressional Committee, and having re-rated Atkinson and Intille three days after their default. To emphasize its displeasure the Majority underscores the *two* and *three* days, suggesting unseeming haste on the part of the Superintendent. But why should the Superintendent not have done his duty at once when he learned that Deacon, Intille and Atkinson had demonstrated themselves to be unsatisfactory teachers?

The School Board, in its argument before this Court, both orally and by brief, cited the case of *Board of Public Education v. Beilan,* 386 Pa. 82, as a precedent for dismissing the three school teachers here. The Majority has repulsed the attempted similarity. The Majority says that the school teacher Beilan was dismissed for a reason entirely different from the reason which motivated the dismissal of the appellants here. The Majority Opinion says in this regard: "His [Beilan's] adjudged incompetency resided exclusively in the fact that he had refused to answer questions of his *administrative superior* (Superintendent Hoyer) concerning

matters deemed to have bearing on his qualifications as a teacher in the public schools of Philadelphia, and not that he had refused to answer questions of a Congressional Committee." (Emphasis in majority opinion)

The Majority Opinion discusses the *Beilan* case for two pages but never once mentions just what was the "disqualification" which justified Beilan's dismissal by the School Board. The fact of the matter is that Beilan was dismissed because he refused to answer the question as to whether he was a Communist, the very reason involved in the case at bar'! The Majority's use of the guarded phrase "matters deemed to have bearing on his qualifications as a teacher," conveys the impression that Beilan was dismissed because he was deficient as a teacher in that he lacked sufficient knowledge in mathematics or Latin or geography, or perhaps stuttered. But it was nothing of the kind. He was dismissed because when he was asked by the Superintendent and a Congressional Committee if he was or had been a Communist he refused to answer.

The Majority attempts to distinguish between the *Beilan* case and the case at bar by saying that Beilan "had refused to answer questions of his administrative superior," whereas, here, a Congressional Committee was involved. But it is interesting and significant to note that Chief Justice JONES in his dissenting opinion in that case said: "The Board avows that it dismissed him [Beilan] for 'incompetency' under the Public School Code for his refusal to answer a question by the Superintendent of Schools on two occasions (June and October, 1952) as to whether he had been press director of the professional section of the Communist Political Association eight years before *and* for his refusal to answer questions of similar nature by counsel for a subcommittee of the Un-American Activities Committee of the House of Representatives on November 18, 1953."

Thus, Beilan was dismissed not only because he refused to answer his immediate administrative superior officer, but also because he refused to answer the questions of a Congressional committee.

Thus, from a standpoint of law, the *Beilan* case is a perfect twin of the instant case and if it was proper to dismiss Beilan, how can the Majority refuse to affirm the dismissal of the three appellants here? It so happened in the *Beilan* case that the Superintendent asked Beilan about his Communist affiliations *before* the Congressional committee questioned him. In the case at bar, the Congressional committee questioned the appellants first. After the appellants had refused to answer the questions put to them by the Committee, it was quite superfluous for the Superintendent to question them again.

There is another startling factor in the *Beilan* case which further emphasizes its identity, legally speaking, with the present case. Beilan had been rated "satisfactory" as a school teacher for 23 years before his arrogant defiance of authority brought him an unsatisfactory rating. In this case Deacon had had a satisfactory rating for 24 years. Thus, the only difference between the two cases, in this respect, is that Beilan was not unmasked for 23 years while Deacon was able to deceive his masters for an additional year.*

---

* The Majority Opinion writer in this case has invited attention to the fact that in the *Beilan* case he wrote a Dissenting Opinion. Therefore, I do not believe that it is improper for me to quote from that Dissenting Opinion. Although here he distingushes *Beilan* from the present case, arguing that Beilan was properly discharged whereas Deacon was not, yet in the *Beilan* case he pleaded as earnestly for Beilan as here he pleads for Deacon. This is what the present Majority Opinion writer said in his Dissenting Opinion in the *Beilan* case: "Here is a case of a long-time public school teacher [Beilan], entitled by statute to tenure, who is deprived of his professional status and livelihood becauase he pleaded the

But there is still a further oneness with the *Beilan* case. It was argued there, as it is argued here, that a refusal to answer questions is not a matter of competence. It was contended on behalf of Beilan that he was being dismissed on the question of loyalty and not competence and that the Court had no jurisdiction under the facts to try him for competence or lack of it. The Majority says the same thing here. It says: "If the refusal to answer a particular question is to be made a basis for the discharge of a professional employee, the question should, obviously, have for its purpose the eliciting of information concerning some matter material to the fitness of the employee to continue at work. This is so whether the question propounded be by a Congressional Committee or by the Board of Education itself. And, if the only material matter to which the question relates is possible disloyalty or subversion on the part of the employee, then any proceeding looking to his dismissal for refusal to answer questions relating to his possible disloyal or subversive activities or affiliations must be brought under the Pennsylvania Loyalty Act of December 22, 1951, P. L. 1726."

But the question put to Beilan, although having to do with his past loyalty or disloyalty, was deemed to have been a proper question for the purpose of eliciting information concerning his fitness for the job of teacher. We held in *Beilan* that even though the question did relate to the subject of subversive activity, it was

---

Fifth Amendment in refusing to answer questions of a congressional committee, touching his loyalty. He has never yet been confronted by his accusers or given an opportunity to cross-examine them."

The point of this quotation is to show that in the view of the Dissenting Opinion writer in *Beilan*, Beilan was discharged because of what he did before the Congressional Committee. The Majority Opinion in *Beilan* sustained Beilan's dismissal and, therefore, becomes authority and should be authority for this Court today, if stare decisis is a guide for us to follow.

still in order for Beilan to be adjudicated under the Act of May 18, 1911, as amended by the Act of June 20, 1939, P. L. 482, which enumerated the grounds for dismissal as "immorality, *incompetency,* intemperance, cruelty, persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth."

Speaking for this Court, Justice CHIDSEY said: "Appellee was charged with incompetency based on his refusal to respond to a pertinent inquiry as to his fitness to be a teacher. The Loyalty Act preempted the field of dismissal for subversion as therein defined, but other causes of dismissal remained unaffected. Section 15 of the Loyalty Act expressly provides: 'The provisions of this act shall not affect the right to discharge any person for any cause other than those provided for by this act or without cause under existing law . . .'. *Moreover the Loyalty Act provides neither the procedure nor the substantive law with respect to the duty of a teacher to answer proper questions. The provisions of the School Code do provide the basis for dismissal of a teacher who refuses to answer such questions.*"

Isn't that what is involved here?

Justice CHIDSEY said further: "Certainly a teacher who refuses to respond to a pertinent inquiry relative to his fitness to teach is not competent within the broad reach of that term, *whether the inquiry concerns loyalty or any other proper subject of inquiry.*"

I should think that that pronouncement ought to dispose of the case at bar, if we are to have respect for stare decisis. But the Majority says it will not be controlled by stare decisis where what this Court said only four years ago conflicts with what it wants to do today. Thus, on the concluding page of its Opinion, the Majority didactically announces: "Anything in the

Beilan case to the contrary is herewith overruled for the future."

This, I must say in all deference, is a rather Procrustean way of deciding cases. The Majority uses the Beilan case where it serves its purpose and then chops off that part of the case which does not happen to fit the particular theory it has placed on the table for measurement, appraisal and supposed justice.

I look with considerable doubt on the propriety of this kind of procedure, and I regard with grave misgivings this decision which certainly does nothing for respect of law, dignity of precedent, and upholding of school authorities seeking desperately to keep the schools free of those who would poison the founts of learning.

The Majority cites the case of *Slochower v. Board of Higher Education of New York City*, 350 U. S. 551, as controlling, but the *Slochower* case is utterly inapplicable to the legal question here involved, and the facts in that case are so different from those in this case that only a discursive liberality can justify making a comparison between them. However, since the Majority Opinion devotes three full pages to a discussion of *Slochower*, I feel constrained to reply with at least one paragraph, and it is this.

A section of the New York City Charter provided that if any city employee, called to testify regarding his official conduct, declined to testify, pleading the privilege against self-incrimination, he would be forthwith discharged. Slochower refused to testify before a Congressional committee, invoking the constitutional privilege, and was discharged. The Supreme Court of the United States reversed, holding that Slochower was denied due process since he was not accorded a hearing whereby he might defend himself. The case here is entirely different. The appellants were officially notified

in writing of their misconduct. They were given a hearing before the School Board where they had a full opportunity to testify, although only one availed himself of that opportunity. They were then accorded an appeal to the Superintendent of Public Instruction, who reviewed the case. They were then allowed an appeal to the court of common pleas where their case was argued and reviewed again. It can't possibly be said, with any regard for historical fact, that the appellants' dismissals were automatic and that they had no hearing.

The Majority veiledly suggest that the hearings given the appellants were not "full" hearings. I have no way of puncturing this rhetorical veil because I do not know what the Majority assumes the veil conceals. I only know I read the record and found that the appellants were treated with punctilio and respect. They had counsel, they had the privilege of cross-examination, they had the opportunity to speak. That two of them refused to testify or speak suggests that perhaps their veils concealed a fault they feared might be revealed under the searching light of cross-examination.

There can be a difference of opinion as to whether the recent decision of the Supreme Court of the United States in *Nelson and Globe v. County of Los Angeles* is applicable to the present litigation. I believe that, if applicable, the decision supports the School Board. Globe was discharged from his county position because, in defiance of a California statute, he refused to answer a question put by a sub-committee of the House Un-American Activities Committee, pleading the Fifth Amendment. Globe argued that he was discharged simply because he invoked the constitutional privilege. The Supreme Court affirmed the dismissal and said: "If Globe had simply refused, without more, to answer the Subcommittee's questions, we think that under the

principles of Beilan and Lerner California could certainly have discharged him. The fact that he chose to place his refusal on a Fifth Amendment claim puts the matter in no different posture, for as in Lerner, supra, at 477, California did not employ that claim as the basis for drawing an inference of guilt. Nor do we think that this discharge is vitiated by any deterrent effect that California's law might have had on Globe's exercise of his federal claim of privilege. *The State may nevertheless legitimately predicate discharge on refusal to give information touching on the field of security.*"

The School Board here has asserted that the three appellants were not discharged for invoking the Fifth Amendment but for refusing to cooperate with a Congressional Committee seeking information which went to the integrity and the safety of the public schools of Philadelphia. What was said by the Supreme Court in behalf of the State of California, could be said here on behalf of the School Board, namely, "The State [Board] may nevertheless legitimately predicate discharge on refusal to give information touching on the field of security."

The Majority here, as is true with so many people discussing the Fifth Amendment, misapprehends the purpose of the Fifth Amendment insofar as it applies to a case of this character. The object of the Fifth Amendment, and its only object (that is, the part here involved), was to prohibit the coercive obtaining of evidence against an accused. There was a time when prisoners were tortured into "confessions." Since anyone in the vise of excruciating pain may sign or utter self-condemning statements no matter how untrue (in order to obtain relief from agony), the framers of our Constitution set up immunity from self-incrimination for all accused. The reason behind this protection is

wholesome and just, and should not be modified, because even today the third degree is not unknown.

However, the Amendment does not stifle the thought processes of the interrogators or spectators and they can evaluate the moral stature of the silent witness, if not his criminal responsibility. When a witness is asked specifically if on a certain day he turned over a government secret document to a Soviet agent and the witness refuses to answer on the ground that his answer may incriminate him, we, who are listening, can see through the mask, and we know that we would never trust that man with a key to our home.

The Majority completely misses the point in this case. As I have said, the only purpose of the Fifth Amendment is to save a person from giving evidence against himself in a criminal prosecution, not to save him from social ostracism, and not from being discharged as a school teacher if his conduct proves him to be incompetent and unworthy and disloyal. The Fifth Amendment is not a lightning rod to ward off the bolts of condemnation which the pleader of the Amendment himself invites. The Fifth Amendment was not intended to be a job saver. It was not designed to be a reputation protector. It is not a raincoat to keep the wearer free from the mud which he splashes on himself. The Fifth Amendment is not a ship which is unsinkable no matter how many holes the pleader bores into it with the auger of his own bad behavior.

Suppose, instead of asking questions as to whether Deacon had been a member of the Communist Party, the Committee asked him: "Do you sell narcotics to school children?" and Deacon had refused to answer, drawing tightly about him the raincoat of the Fifth Amendment, would not the Board have been justified in rating him "unsatisfactory" at once, without waiting two or three days to do so?

I would like to ask every member of this Court who supports the Majority Opinion if he would want as a teacher of his children a person who, when asked if he trafficked in narcotics with the school children under his charge, replied that he refused to answer. I would like to put to every member of this Court who supports the Majority Opinion whether, as a good citizen, tax-payer, and man of the law, he would not demand that the School Board dismiss such a teacher as not only unworthy morally but wholly incompetent to teach children since it is obvious that a teacher who cannot see the evil of selling marihuana cigarettes to his school children certainly cannot be reliable in teaching any part of the school curriculum.

Suppose Deacon had been asked: "Are you the person who burned down the Epochal High School?" and he replied he would not answer because of the Fifth Amendment, would the Majority condemn the School Board for separating Deacon from his job?

The Majority says that because the Fifth Amendment is a Federal guarantee, the State may not penalize any person for using it. But I must repeat that the purpose of the Fifth Amendment is to protect its user from improper criminal prosecution, not from any other results which may follow from it, entirely unrelated to criminal prosecution. Deacon, Intille and Atkinson had the constitutional right to refuse to give answers which might incriminate them criminally, but they have no constitutional right to be school teachers. In a celebrated case in Massachusetts where the right of free speech was involved, the illustrious Justice OLIVER WENDELL HOLMES made the significant remark: "The petitioner may have a constitutional right to talk politics but he has no constitutional right to be a policeman."

Suppose Deacon had been asked: "A year ago you said that your wife died of natural causes, but we now

have evidence that she was killed criminally. Did you kill her?" And suppose Deacon had answered: "I refuse to answer that question because the answer might incriminate me." Here he would have availed himself of the Federal right, which the Majority so stresses in its Opinion, but would that Federal right save him from being dismissed as a school teacher? Could a school board keep as a school teacher a person who refuses to answer, when seriously asked the question, whether he is a murderer?

The purpose of the Fifth Amendment is not to save one from results, apart from criminal prosecution, which are natural to a refusal to answer the accusation of an opprobrious crime.

Suppose a school physician had been asked if he was infected with a malignant communicable disease and he refused to answer, would the School Board not be justified in refusing to permit him to treat school children and in discharging him as school physician?

The framers of the Constitution would turn in their graves if they could know how guarantees to protect the liberty of Americans are being used to destroy the very American form of government. The decision of Courts which not only protect potential traitors in their allegiance to hostile foreign powers but which assure them tenure in positions where they can best use their alien ideology against the American form of government are decisions which could cause the statutes of the colonial patriot martyrs to leap from their pedestals and sorrowfully retreat to Valley Forge to weep over the disappearance of principles for which they sacrificed their lives to attain and establish.

The Majority Opinion says: "The appellants' pleas of the Fifth Amendment did not prove their incompetency within the meaning of the Public School Code."

Here the Majority ascribes a very narrow meaning to the word "incompetency", as used in connection with

the qualifications of a school teacher. Competency, where a school teacher is involved, does not mean mere technical qualification. A person who can carry the contents of the 24 volumes of the Encyclopedia Brittanica in his head but does not have a page of the moral code in his heart is obviously incompetent to teach school children.

Nor does the word "incompetency" have the lexicographical limitation sometimes popularly supposed. Webster's New International Dictionary defines it as "want of physical, intellectual, or *moral* ability; insufficiency; inadequacy; specif., want of legal qualifications or *fitness*." Funk & Wagnalls Standard Dictionary defines incompetency as: "General lack of capacity or *fitness,* or lack of the special qualities required for a particular purpose."*

This Court in the case of *Horosko v. Mt. Pleasant Township School District*, 335 Pa. 369, 374-375, said with reference to the word "incompetency" "The term 'incompetency' has a 'common and approved usage.' The context *does not* limit the meaning of the word to lack of substantive knowledge of the subjects to be taught. *Common and approved usage give a much wider meaning.* For example, in 31 C.J., with reference to a number of supporting decisions, it is defined: 'A relative term without technical meaning. It may be employed as meaning disqualification; inability; incapacity; *lack of ability, legal qualifications, or fitness to discharge the required duty.*' In Black's Law Dictionary (3rd edition) page 945, and in Bouvier's Law Dictionary (3rd revision) p. 1528, it is defined as 'Lack of ability or *fitness to discharge the required duty.*'"

With these authoritative definitions and expositions in mind, the exclamation point employed in the Ma-

* Quoted in *Horosko v. Mt. Pleasant*, 335 Pa. 369, 374.

jority Opinion to cynically condemn the School Board for dismissing Deacon as incompetent because of his refusal to answer the Congressional Committee's questions, does not carry the sardonic implication intended for it.

Since Deacon was admittedly a Communist for six years, during which time he was also a school teacher, his refusal to talk about the machinations of the Communist Party was in itself evidence of incompetence in its revelation of a lack of awareness of his moral responsibility to cooperate with the Congressional Committee and to give it the information he possessed. If, after six years of being an active member of the Communist Party, he did not know what the Communist Party stands for, this was about the most conclusive evidence of school teacher incompetence that one could imagine—exclamation point. Such ignorance and incompetence would be the ignorance and incompetence of a worker carrying a lighted torch into a gunpowder magazine.

If a school teacher is indeed a Communist he obviously is not qualified to remain as a school teacher in the public schools of the United States. If he is not a Communist but refuses to say he is not a Communist, and therefore permits the inference that he may be, he thereby conclusively establishes lack of character and reliability which would make him utterly incompetent as a school teacher. The captain of a ship who refuses to haul down the skull and crossbones which, correctly or incorrectly, flies from his masthead, cannot complain if he is fired on for being a pirate.

Now, on what basis did the School Board conclude that the three appellants in this case were incompetent to teach school children. Superintendent Hoyer testified with regard to Deacon: "I have checked three items that enter into this rating of unsatisfactory. One of

these is the item of civic responsibility, and I have checked that as unsatisfactory because I believe Mr. Deacon's refusal to cooperate with the committee before which he appeared warrants that rating. I am firmly convinced that a person, any person, any citizen, should cooperate with a properly constituted committee of the Congress, and I think a teacher especially ought to do that. Mr. Deacon did not do it, and I therefore considered that his concept of civic responsibility was a poor one and rated him unsatisfactory on that score.

"I have marked also the question of judgment. I think his judgment in the line of action that he took was faulty. I think his judgment in being in a position where he would have to take that line of action was faulty, and I therefore marked judgment as unsatisfactory.

"I also marked the question of ideals, appreciations and ideals, but particularly ideals here, as unsatisfactory, because I am convinced that a teacher should have such ideals of relationship to his government, such ideals of citizenship, that he will cooperate under the circumstances considered here. I therefore rated Mr. Deacon as unsatisfactory on those three counts."

His testimony with regard to Atkinson and Intille was approximately the same. Of Atkinson, he particularly noted: "And I think, both by way of indicating her general attitude toward this situation and because of the example which it showed to pupils in her school and those with whom she was associated, that it indicated unfitness to be a teacher."

Of Intille, he specified, in addition to the general rating of her incompetence: "I considered her examination before the Committee as an evidence of extreme lack of civic responsibility on her part. And civic responsibility is one of the major elements in the competence of a teacher to appear before children in our schools.

"I marked also the item of appreciation and ideals— the ideals part is the important part—because I believe that a teacher who has the proper ideals with regard to her responsibilities to the government of our country will not take the position which Mrs. Intille took in this case. I therefore marked her unsatisfactory in connection with this item also."

It must be kept in mind throughout the consideration of this case, as already stated, that the School Board did not discharge the three appellants for invoking the Fifth Amendment as protection against a possible criminal prosecution, but for their refusal to co-operate with a Congressional Committee officially interrogating about conditions in the Philadelphia schools. If the appellants had pleaded the First or Ninth Amendment or no Amendment at all and had simply refused to answer proper inquiries put to them, their incompetency in the circumstances, as we will now relate them, would equally have been established.

The brief filed by the School Board very properly points out: "One of the purposes of the public school system is the education of citizens for the rights and obligations of citizenship in a democracy. The public schools do not exist solely for the purpose of training the child to earn his living. Such a limited purpose, by itself, would scarcely justify the huge sums raised by taxation to support and finance the State's vast public educational program. The State and Nation are intended to benefit from the education of citizens. It is intended that pupils shall understand the meaning of patriotism, appreciate the concept of loyalty to State and Nation, and value the heritage of the American way of life. These purposes are explicit in the Public School Code (Act of March 10, 1949, P. L. 30, §§1511, 1515, 1605, as amended, 24 P.S. §§15-1511, 15-1515, 15-1605)."

It will be seen by these references to the Public School Code that the three appellants had certain obligations to discharge and duties to fulfill in answering the questions put to them by the Congressional Committee inquiring into conditions in the very schools in which the appellants were teaching. If they were to be rated as satisfactory school teachers they were required to live up to the requirements of the School Code. This is a point wholly ignored by the Majority decision.

Now, no one can deny that there was much discussion in 1953-54 to the effect, rightly or wrongly, that many persons in the public school system of the United States had succumbed to the Communist ideology. The subject was debated in the newspapers, on radio and television, from the platform, in the pulpit and every other form of public discussion. Naturally, it occupied the very serious concern of both Houses of the American Congress. A report published by the Internal Security Sub-Committee of the Judiciary Committee of the United States Senate in July, 1953, declared: "World Communist leaders have made schools and colleges of the United States a target of infiltration activity a part of the program to destroy the United States."

"A communist educator, because of his submission to a totalitarian organization, cannot maintain the standards of academic freedom and objective leadership and be loyal to the regulations of local authorities."

"Communist teachers use their positions in the classroom and in extra-curricular activities to subvert students and other teachers and the public to promote the objectives of Communism."

"The testimony before the Subcommittee has convincingly demonstrated that such teachers [Commu-

nist] are not only actively engaged in injecting Communist influence into our educational institutions but that they do this through oblique and indirect methods under Communist Party direction."

"Teachers [Communist] are subjected to a thorough indoctrination on joining the Communist Party in order to insure their conformance to the party line."

"On April 17, 1953, Herbert Philbrick, former FBI undercover man in the Boston Communist Party, testified to the existence of an Education Commission in each district of the Communist Party, as well as nationally."

"The evidence shows that the activities of the Communist Party are subject to the most rigorous review and discipline of the Communist hierarchy."

It is with this background of disturbing revelations that the Committee on Un-American Activities of the United States House of Representatives came to Philadelphia to inquire into conditions in the Philadelphia School System. The Committee knew that Bella Dodd, an ex-Communist school teacher, had testified that out of a membership of 14,000 school teachers in the New York Teachers Union, 1000 of the teachers were Communists. What were conditions in the Philadelphia schools? Not only did the Committee have the right but the duty to know so that they could intelligently and efficiently formulate legislation which would protect the school children from subversive influences which, unless checked, could, through the coming years, bring about the eventual destruction of the American way of life.

Thus, it was not an idle visit which brought the House Un-American Activities Committee to Philadelphia. Nor was it a punitive expedition. It was not interested in bringing criminal prosecutions against Deacon, Intille and Atkinson or anyone else who might

come before the Committee. It wanted information, and the teachers who were duly subpoenaed before it had the duty under the School Code, to say nothing of loyalty to the United States, to give them the information within their personal knowledge to give. The Committee wanted to know to what extent, if any, the Communist Party had infiltrated into the Philadelphia school system.

It had evidence that Deacon had at one time been a member of the In Town Department of Section 8 of the Communist Party. He was asked if this was true. Deacon refused to answer on the ground of the Fifth Amendment. He said he took the loyalty oath in April, 1952, and that he was not presently a Communist. However, if he was a member of the Communist Party from 1939 to 1945, as he later admitted to the School Board, he was in an excellent position to help the Committee by telling its members and, through them, Congress itself, as to how far the Communists had infiltrated into the Philadelphia school system.

Deacon was in an especially excellent position to help Congress by a full and frank disclosure of what the Communists were doing in the Philadelphia schools because, since the Statute of Limitations had run in his favor, he could not be criminally prosecuted for Communist membership between 1939 and 1945. His refusal to testify, therefore, cannot be excused on any supposition that he was exercising a Constitutional privilege in order to avoid criminal prosecution. He had no Constitutional privilege to advance. His refusal to testify was a manifestation of arrogance, defiance and contempt for the constituted authorities legitimately inquiring into a situation which required investigation.

Deacon's refusal to testify could well have been interpreted as a lingering adherence to the tenets of the

56

Communist Party, and a reluctance to arm the United
States authorities with information and data which
would help this country fight the international con-
spiracy of which he had once been an active dues-pay-
ing member. In any event, how can there be any doubt
that he demonstrated himself morally unfit to be a
teacher of school children in our public schools? How
can there be any doubt that by his contumelious con-
duct he proved himself to be incompetent?

A school teacher must conduct himself in such a
manner as to command respect, or his efficacy as a
teacher is lost. Anything which a teacher does which
disgraces him in the eyes of the law-abiding community
in which he lives and teaches affects his competency
to teach. The Court of Common Pleas of Philadelphia
County which approved the dismissal of Deacon prop-
erly and cogently said: "As was pointed out both in
the Horosko case and in the opinion of the United
States Supreme Court in the Beilan case, a teacher
who does not conduct himself in such a way as to com-
mand the respect and good will of the community is
incompetent. It would seem clear that a teacher who
fails to answer pertinent questions before a Congres-
sional Investigating Committee is much more likely to
lose the respect and good will of the community than a
teacher who refused to answer the same questions in
the privacy of the office of the school authorities."

The attitude of Mrs. Intille and Mrs. Atkinson was
no less demonstrative of their incompetence as school
teachers. Of Mrs. Intille, Judges ALESSANDRONI and
REIMEL properly said: "Certainly the refusal of appel-
lant to answer questions of a duly constituted Com-
mittee of our Congress is a dreadful example for a
teacher to set for pupils. Whether appellant is a sub-
versive or not, such conduct before a committee of the
highest legislative branch of our government can only

foster in the impressionable children under her tutelage
a settled contempt and arrogance for our country and
its lawmakers."

Judge MILNER who passed on the Atkinson case in
the Court below said: "The term 'incompetency' as used
in the Public School Code of Pennsylvania is not con-
fined to the classroom activities of a teacher or to the
teacher's educational background or mastery of the
teaching art. A schoolteacher's influence upon her
pupils is not limited to what she says and does in the
schoolroom, and a teacher's right to teach cannot de-
pend solely upon her conduct in the school . . . A
teacher's incompetency may be determined on the basis
of her actions entirely outside the classroom and out-
side school hours, where her conduct tends to bring her
into public disrepute and to forfeit the respect and con-
fidence of the community."

The Majority Opinion does not touch upon this vital
phase of the case at all. It ignores what Judge MIL-
NER also ably said: "She [Mrs. Atkinson] was not
branded incompetent because she was or had been a
Communist. She was regarded by her employing board
and by her superintendent as unfit to continue as a
teacher because of her lack of frankness, candor, and
cooperation; because, in a time of national stress and
danger, perhaps the gravest danger that has ever con-
fronted the nation, she took refuge behind a cloak of
secrecy."

The Supreme Court of the United States said in the
same *Beilan* case we have discussed, 357 U. S. 399: "We
find no requirement in the Federal Constitution that a
teacher's classroom conduct be the sole basis for deter-
mining his fitness. Fitness for teaching depends on
a broad range of factors."

The Supreme Court of the United States said in the
case of *Adler v. Board of Education of New York,* 342

U. S. 485, 492: "It is clear that such persons [employed or seeking employment in the public schools] have the right under our law to assemble, speak, think and believe as they will . . . It is equally clear that they have no right to work for the State in the school system on their own terms. . . . If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere."

Of all this, the Majority shows no interest. Instead, it speaks of *locus penitentiae* for the appellants, especially Deacon. It chastises the School Board for not being more merciful toward an ex-Communist who is now sorry although there is no evidence that he is sorry. Deacon was not sorry for what he had done in collaborating with other members of the Communist Party of the United States, the Communist Party that was responsible for the theft of our atomic bomb secrets, the Communist Party that has sheltered and aided Soviet spies, the Communist Party that has approved of all the Soviet aggressions abroad, particularly the merciless and murderous suppression of the Hungarian fight for freedom.

The fact of the matter is that the School Board of Philadelphia has shown itself quite merciful toward ex-Communists who have truly and sincerely admitted the errors of their way and have expressed their realization that the Communist Party's program is inimical to the best interests of the school children of America, and that thenceforth they would live up to the standards and ideals of American democracy. But Deacon was not one of these ex-Communists. He expressed no regret. Nor did Intille express any regret. Atkinson expressed no regret. Instead, the three of them adopted an attitude of arrogance and defiance to constituted authority. Can a School Board do its work in protecting the school children from influences which under-

mine character if they allow on their teaching staffs persons who belligerently refuse to abide by the simplest rules of honesty and fair dealing? Where is the *locus penitentiae?*

Is the Communist threat a reality or a myth? Is Communism determined on world conquest or is it not? It has already subjugated one-fourth of the earth's surface and one-third of its population. We have seen country after country fall under the sinister tramp of the Fifth Column. We know that in the United States some labor unions have become puppets of the Soviet regime. When Khrushchev visited the International Longshoremen and Warehousemen Union in California, headed by the Communist-dedicated Harry Bridges, he was greeted as a man come home. We have seen how the Teacher's Union itself was thrown out of the A.F. of L. and the C.I.O. because of its participation in the Communist conspiracy against democratic government. How then can the Majority seriously maintain that with such insidious forces working in our very midst a school teacher should not give undivided loyalty to our institutions and the law of the land? If Deacon, Atkinson and Intille prefer the Communist ideology, so be it, but they have no right to remain school teachers where they will command the ramparts of instruction for the future citizens of America.

The Supreme Court of California spoke in words which needed to be spoken when it said: "In the life-and-death struggle into which our people have been plunged by the monstrous conspiracy called communism, it is becoming more and more apparent that it is essential for the continuance of our national life that we know who is for us and who is against us. This is no time to allow any person who would destroy us, our liberties, our religious convictions, and our government

to be employed in any branch of that government, 'to bite the hand that feeds it.' The men and women of America who pay their salaries have a right to know whether or not any of their employees are communists." (*Board of Education v. Wilkinson,* 270 P. 2d 82, 86).

How can the Majority ignore what was said by the Supreme Court of the United States, in the case of *Adler v. Board of Education of New York,* 342 U. S. 485, 493? "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted. . . . From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate."

The Majority treats cynically, as I have already stated, the fact that the School Board rated Deacon incompetent because he refused to answer questions put by the Congressional Committee and emphasized its cynicism with an exclamation point, but this very Court in the case of *Horosko v. Mt. Pleasant School District,* supra, 371, said: "If the fact be that she [a school teacher] 'now commands neither the respect nor the good will of the community' and if the record shows that effect to be the result of her conduct within the clause quoted, it will be *conclusive evidence of incom-*

*petency.* .It has always been the recognized duty of the teacher to conduct himself in such way as to command the respect and good will of the community, though one result of the choice of a teacher's vocation may be to deprive him of the same freedom of action enjoyed by persons in other vocations. Educators have always regarded the example set by the teacher as of great importance. . ."

I don't see how there can be any doubt that Deacon, Intille and Atkinson lost the respect and good will of the community by their conduct before the Committee when, as heretofore stated, one of them deliberately concealed from the Committee that he had been a Communist in a period now beyond the Statute of Limitations, when another one of them attempted to barter with the Committee as to her answers, and the third flouted sworn testimony of documentary evidence of subversiveness.

The Majority attributes, very unfairly I think, to the School Board a devious planning to avoid proceeding under the Pechan Loyalty Act. It says: "The Board's action evidences a belief that it has found a way to dismiss, without any evidence at all, teachers whom it suspects of disloyalty or subversion."

Is it no evidence at all when one of the appellants, Deacon, admits himself having been a Communist for six years? Is it no evidence at all when there is sworn testimony that there was issued to Mrs. Atkinson a Communist Membership book in the year 1945, the number being 86905? Is it no evidence at all when Mrs. Intille, when openly accused of being a Communist, refused to answer? Is it no evidence when she tried to barter with the Congressional Committee that she would answer one question if the Committee would agree not to put any more questions to her? Here indeed is the place for an exclamation point! I would

say that Mrs. Intille's disgraceful attempt to strike a bargain with the Congressional Committee on a question involving loyalty to the United States was not only improper but colossal effrontery which, in itself, demonstrated her to be incompetent as a school teacher and as one incapable of commanding respect in the community.

I believe that the action of this Court in the present case is not warranted by the previous decisions of our Federal and State courts, I believe it is not warranted by the principles of undeviating justice which should prevail in the disposition of all litigation. I believe it is critical of the School Board of Philadelphia without cause and cripples them in their superb efforts to weed out those who are unworthy of the proud and glorious title of school teacher and who, because of their incompetence, disloyalty, discourteous manner and arrogant attitude, should not be entrusted with the delicate and vital task of shaping the character of the future citizens of America.

For these reasons which could be elaborated on for even 25 more pages, if time permitted, I strenuously dissent.