## Board of Public Education, School District of Philadelphia, Appellant, *v.* August.

230

Argued November 30, 1961. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and Alpern, JJ.

Appeal from decision of Superintendent of Public Instruction affirming decision of school board dismissing teacher.

Adjudication filed sustaining appeal and order entered, opinion by Blanc, J. Board of Public Education, School District of Philadelphia appealed.

*C. Brewster Rhoads*, with him *Sidney L. Wickenhaver*, and *Edward B. Soken*, for appellant.

*William J. Woolston*, for appellee.

Opinion by Mr. Justice Musmanno, January 17, 1962:

The fidelity, candor and intellectual honesty which a school teacher owes to the public school system of which he forms a part is the subject matter of this appeal. The precise issue is whether a school teacher who refuses to cooperate with the school superintendent in an inquiry on the matter of loyalty to the United States may be dismissed on the ground of incompetency, which is one of the reasons assigned in the School Code for dismissal.

The facts leading up to a determination of that issue may be summarized as follows:

In 1934 Bernard August was engaged as a teacher in the Philadelphia public schools and assigned to the Gratz High School, teaching mathematics. In 1943 he was transferred to the Olney High School, continuing to teach the same subject. In that same year he joined the Communist Party, actively participating in its program. In time he became the financial secretary of the Northeast branch of the Communist Party, collecting dues from fellow-members and transmitting the money to Communist central headquarters.

On October 14, 1952, he was summoned to the office of the Superintendent of the Philadelphia Public Schools, Dr. Louis P. Hoyer, who informed him that he had some questions to put to him on the subject of loyalty. August replied that he would not answer questions and wanted to consult with his attorney. Eight days later, October 24, 1952, he called Dr. Hoyer by telephone and informed him that he had been advised by his attorney that he was not required to answer questions on the topic mentioned by Dr. Hoyer, namely, loyalty.

On November 20, 1953, Superintendent Hoyer gave August an unsatisfactory rating as school teacher, particularly marking him deficient under the headings of professional relationship, judgment, professional attitudes, civic responsibility and appreciation of ideals. Five days later the Board of Public Education suspended him as a teacher, preferring charges against him on the grounds of incompetency and persistent wilful violation of the school laws of Pennsylvania.

On February 17, 1954, he was called before the House Un-American Activities Committee to testify regarding his Communist membership. He refused to answer questions, pleading the First and Fifth Amendments of the Federal Constitution.

On March 22, 1954, the Board of Public Education of Philadelphia conducted a public hearing into the

charges it had brought against August and, on April 12, 1954, ordered his dismissal as a school teacher. He appealed to the Court of Common Pleas No. 6 of Philadelphia County which reversed the decision of the Board and ordered his re-instatement. The Board appealed to this Court.

A decision filed during this session in the case of *Board of Public Education, School District of Philadelphia v. Soler,* 406 Pa. 168, holds that a school teacher who refuses to answer relevant questions put to him by the Superintendent of Public Schools makes himself liable to a charge of insubordination and incompetency and may, in consequence, be dismissed from his employment even though the questioning is directed to the matter of loyalty. This decision follows the ruling in the case of *Board of Public Education v. Beilan,* 386 Pa. 82, which was affirmed by the Supreme Court of the United States (357 U. S. 399). It was argued in the Court below in the *Soler* case, as well as in the case at bar, that the Beilan precedent had been overruled by the decisions of this Court in the cases of *Board of Public Education v. Intille,* 401 Pa. 1, and *Board of Public Education v. Watson,* 401 Pa. 62.

But it is quite evident that the *Intille* and *Watson* decisions in no way affected the ratio decidendi of the *Beilan* decision. The statements in *Intille* and *Watson* which suggest anything to the contrary were dicta voiced by the opinion writer and, as stated in the *Soler* decision, are disavowed.

Thus, the law is settled definitively and conclusively that when a school teacher refuses to answer questions which are put to him by the Superintendent of Schools or any other authoritative school superior concerning his fidelity to the United States, the School Board may proceed against that teacher under the provisions of the Public School Code of March 10, 1949, P. L. 30, §1122 et seq., as amended, 24 PS §11-1122 et seq., and

is not limited to the procedure designated in the Pennsylvania Loyalty Act (also known as the Pechan Act) of December 22, 1951, P. L. 1726.

This ruling does not mean, as suggested by counsel for the appellee, the dismantling of the machinery set up in the Pechan Loyalty Act. If a school superintendent, while interviewing a school employee, ascertains that he is or was a member of the Communist Party, and the evidence warrants further action, the Superintendent then turns to the mechanism of the Pechan law.

Any initial interrogation on loyalty in no way conflicts with the purposes of the Pechan Act. A school superior certainly has the right to ask a teacher whether he has ever engaged, for instance, in the sale of narcotics. He possesses no less authority to inquire whether the teacher ever belonged to an organization committed to the overthrow of our government by force and violence.

No one could reasonably deny to the Superintendent of Schools the authority to question an employee, when there is reason to support the inquiry, whether the employee has committed any crime, or conducted himself in any manner, inimical to the best interests and welfare of the children in the school where he is employed. If the Superintendent asked a teacher whether he had committed arson and the teacher refused to answer, could it be maintained that the school authorities would not have the right, and the obligation, to dismiss the teacher on the basis of incompetence? Is burning down a dwelling any less culpable and reprehensible a deed than taking an active role in an organization committed to putting fire to the house of democracy, designed by the architects of the Constitution and built by all Americans since 1776?

Despite arguments to the contrary by the appellee, the procedure followed by Dr. Hoyer in the case at bar

better protected, in limine, Bernard August from any unjust imputation than would a grinding of the Pechan machinery. The conference conducted by Dr. Hoyer was a private one, so that August was spared all embarrassment or public harassment. If, however, instead of this initial investigation, the Loyalty Act had publicly taken hold, and it had developed later that August was entirely innocent, he might still suffer from the effects of passing through the Pechan machinery, which, even with expert hands at the control, could well have left him with bruises and hurts.

Thus, it is self-delusion to argue that somehow the appellee in this case, or any school employee, would be better off, when a question arises as to loyalty, to be taken immediately into the mechanism of the Pechan Act.

And then, aside from what the procedure, in either event, means to the employee, the proper administration of the schools demands a prompt personal inquiry into equivocal conduct on the part of an employee. In explaining why he called August for questioning, Dr. Hoyer said: "I considered it important, first of all, because I wanted to discover, if I could, by conference and by conversation with Mr. August, whether or not the facts indicated in the statements [regarding August's membership in the Communist Party] were correct, and also whether the relationships indicated in the questions had persisted to the present time. I considered them important also, or considered my desire important, because *they had bearing, in my estimation, on the fitness of Mr. August to be a teacher in the Philadelphia Public School System* and it is my responsibility to make certain that the teachers who come into the Philadelphia school system or who remain in it *are fit persons to be there.*" (Emphasis supplied).

Such a declared purpose can only be commendable.

Any superintendent, who would allow statements, or even rumors, of disloyalty to go uninvestigated, would be derelict in the performance of his duties. A ship captain who learns that a member of his crew is making statements about mutiny or is indifferent to his responsibilities for the safety of the vessel, would be a traitor to his own responsibilities if he did not call in that crew member and demand to know if there was truth to the circulating report.

In the *Soler* case the school teacher was dismissed because he failed to reply to questions advanced by the Superintendent of Public Instruction. He maintained, as August maintains here, that the procedures providing for dismissal under the Pechan Act are mandatory and exclusive. Chief Justice BELL disposed of the Soler contention with the statement that "appellee was not dismissed on the ground of disloyalty; he was dismissed on the ground of *incompetency* because of insubordination and lack of frankness, candor and intellectual honesty."

Justice FRANKFURTER, in his concurring opinion in the *Beilan* case, supra, and the case of *Lerner v. Casey*, 357 U. S. 468, said: "When these two employees were discharged, they were not labeled 'disloyal'. They were discharged because governmental authorities, like other employers, sought to satisfy themselves of the dependability of employees in relation to their duties. Accordingly, they made inquiries that, it is not contradicted, could in and of themselves be made. These inquiries were balked. The services of the employees were therefore terminated."

It thus is settled law in this State that a school employee owes the duty of frankness to his administrative superior; and is obliged to cooperate. To repeat the words of Chief Justice BELL, a school employee may be dismissed because of "insubordination and lack of frankness, candor and intellectual honesty."

Was Bernard August insubordinate? Did he exhibit a lack of frankness, candor and intellectual honesty in his dealings with his administrative superior? Essentially that is the key which opens the lock on the answer to the question involved in this appeal.

In the case of *Albert Appeal*, 372 Pa. 13, Chief Justice STERN said: "The Constitution of the Commonwealth, Article 10, Section 1, provides that 'The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools.' Certainly our public school system is the most vital feature of our governmental and democratic system. In order to have such a 'thorough and efficient system' those who teach in the public schools must be persons not only of learning and ability, of character and integrity, but they must be devoted to our country, its institutions and the basic principles upon which it was founded and hopefully will ever rest . . . it is essential, in order to protect our children from treacherous influences, that persons who advocate or participate in subversive doctrines should not be employed, or if employed should not be retained, as teachers in our public schools, and any teacher dismissed for such a reason cannot properly claim that any constitutional or legal right is thereby violated."

When Superintendent Hoyer was informed that one of his teachers was participating in subversive doctrines he proceeded to determine at once the true fact by talking to the school teacher himself. He was entitled to cooperation from him, in accordance with the mandates of the Constitution and the laws of the Commonwealth. Did he receive it?

The court below held that August did give that cooperation. This conclusion on the part of the court, in the face of the record, suggests a complete blotting out of the vast forest of fact because of a few scraggly trees of sophistry. The court quoted from Dr. Hoyer's tes-

timony and, from the indicated quotation, found that Dr. Hoyer did not ask August any questions at the first interview and that, therefore, August could not reply. It is true that, taken apart from everything else in the record, one could read from replies made by Dr. Hoyer, in one circumscribed part of the record, that August was not questioned. However, when one reads the entire record it becomes as plain as a pikestaff that August was under interrogation at that first interview. Otherwise, why did he tell Dr. Hoyer that he would speak to his counsel before he decided whether he would answer questions put by Dr. Hoyer? In fact, the school teacher himself, Bernard August, testified that Dr. Hoyer questioned him. Here is his testimony: "When I came into the room, Dr. Hoyer . . . said that he had received certain information which he felt it was his duty to *question me about* . . . He said, *I have certain questions that I want to ask you.* I said, What type of question? I would like to know what the questions are before I undertake to answer them . . . Mr. Soken [Counsel for Philadelphia School Board], who was present, interrupted to say that there was no reason why I had to know what the questions were before I agreed to answer or refused to answer. Dr. Hoyer, however, very politely said, *I see no harm in letting him hear one of the questions.* And the question was something to the effect, there is sworn testimony, or something like that, to the effect that you were a member of the North Philadelphia branch of the professional section of the Communist Party of Philadelphia. And I said, well, *I would not undertake to answer questions of that sort without first consulting an attorney.*" (Italics supplied).

Thus, Dr. Hoyer, did put at least one question, and it was only because of August's refusal to answer, that more were not forthcoming at that time.

The court misread the record in another connection. It said: "No second interview was ever arranged, neither at that time nor at any subsequent time."

Here is Dr. Hoyer's testimony on that phase of the case: "Q. Doctor, why was there a second conference arranged for? A. *The second conference was arranged* because Mr. August had indicated his desire to consult counsel, and of course I agreed to his request." (Emphasis supplied.)

Thus, a second conference *was* arranged. It did not blossom on the tree of reality because August killed the roots of the tree with the frost of his defiance and hostility. He telephoned Dr. Hoyer and informed him that he would not answer the questions which Dr. Hoyer wished to address to him.

But the lower court argued: "the mere receipt of a telephone call which purports to set up a future course of conduct, which course of conduct was never tested, cannot be sufficient cause for dismissal. Mr. August should have been afforded the opportunity to meet face to face with his superior and upon notice of the possible result of his persistent refusal, be given the opportunity to reach a decision."

This argument would suggest that Mr. August is a child. When he told Dr. Hoyer that he would not answer questions, after he had already had eight days to consider whether he would answer or not, certainly Dr. Hoyer could assume that August would not answer questions. It would have been an infantile performance to prepare the stage for another conference, in the face of August's refusal to answer, and then on that stage of futility for Dr. Hoyer to attempt by cajolery, persuasion and implied threat to get August to answer.

August was no naive babe in pedagogic woods. He was a college graduate, he had been a teacher for eighteen years. He knew English and he knew that Dr.

Hoyer knew English. Then when he, with the finality of an ax stroke, told Dr. Hoyer he would not answer questions, a "face to face" meeting on the same subject, as desired by the lower court, would not only be superfluous but inane and fatuous.

It is a strange argument which criticizes Dr. Hoyer for not giving to August what he spurned. August did not want another conference because he knew that Dr. Hoyer intended to talk to him, not on the state of the weather, but on the state of his attachment to Communist ideology. Reflecting on the possibility of such a "face to face" interview, he saved face, as he undoubtedly thought, by staying away. The record is clear that it was August who torpedoed the first conference and it was he who sank all possibility of a second conference by telling Dr. Hoyer that to all questions on the question of loyalty he would stand mute. Although he indicated to Dr. Hoyer he would be deaf to all questions, it was very clear that in his line of reasoning he was not dumb. The following episode will illustrate.

At the conference on October 14th Dr. Hoyer told August that he intended to read certain statements to him about his activities involving loyalty, and he would then ask August to confirm or refute those statements. August said he would not answer the questions and then added: "Why should I admit anything before I see whether you can corroborate it?" This is like a person charged with larceny, who, being asked whether he has the purse of the victim in his pocket replies: "I refuse to answer that question until I find out if you have any evidence I have the purse."

In this very exchange with Dr. Hoyer, August exposed his lack of candor and deficiency in those qualities of professional attitude, civic responsibility and appreciation and ideals on which Dr. Hoyer later rated him adversely. August's wanting to know what evidence had been gathered on his Communist activities

so that he could avoid making damaging admissions on matters which could not be proved against him, was indeed a cunning piece of strategy, but a strategy which proved him to be more shrewd than faithful.

Bernard August further objected to Dr. Hoyer's questioning him because, he said, such questioning was "un-American" and "unfair." This is another demonstration of August's lack of appreciation of the duty he owed his school superiors. He explained that he did not need to answer because Dr. Hoyer wanted to question him about his "political activities." Only a person as separated from the history of the times as a shipwrecked sailor on an ice floe in the Artic, only a person at war with all reality and living in a state of sheer perversity, only a person with a brain so enslaved to Communist ideology that he is deaf, dumb and blind to the cruelties, inhumanity, and bestial greed of Communism, as decreed by the Kremlin and enforced by bayonet, bomb, treachery, barbed wire and stone walls throughout the world, could say that membership in the Communist Party may be equated with what in the United States we regard as "political activities."

The Communist Party is not a political party; it is a criminal conspiracy designed and determined to destroy democratic government everywhere but particularly in America. This objective of the Communist Party has been officially pronounced by Congress, by the Pennsylvania Legislature, by the Federal Courts and by the Pennsylvania courts. This fact, although it looms against the horizon of contemporary history as clearly as the Rocky Mountains, the Empire State Building, and the Washington Monument, yet needs to be repeated because there are still supposedly educated people who will insist, as did the appellee in this case, that to dip one's hands to the armpits into the muck of Communist ideology is only an exercise of one's

rights to participate in "political activities."

The Internal Security Act of 1950 (Public Law 831, 81st Congress, Chapter 1024, 2nd Session) declares: "The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of American institutions."

The Pennsylvania Act of December 21, 1951, P. L. 1712, proclaims that: "Upon evidence which has been presented and proof which has already been established before the Congress of the United States, the federal courts of the United States, the courts of the Commonwealth of Pennsylvania, and the General Assembly of the Commonwealth of Pennsylvania, there exists an international revolutionary Communist conspiracy which is committed to the overthrow by force and violence of the government of the United States and of the several states, . . . such conspiracy including the Communist Party of the United States, its local components in Pennsylvania, and *the members thereof.*" (Emphasis supplied.)

In *American Communications Ass'n v. Douds,* 339 U. S. 382, 425, Justice JACKSON said: "The goal of the Communist Party is to seize powers of government by and for a minority rather than to acquire power through the vote of a free electorate . . . It purposes forcibly to recast our whole social and political structure after the Muscovite model of police-state dictatorship. It rejects the entire religious and cultural heritage of Western civilization, as well as the American economic and political systems."

In the case of *Pawell v. Unemployment Compensation Board of Review,* 146 Pa. Superior Ct. 147, 150, 151, the Superior Court said: ". . . courts have long

recognized and have taken judicial notice that Communism, as a political movement, is dedicated to the overthrow of the government of the United States [and, with it, the governments of the States as necessary incidents in our system of divided sovereignty] by force and violence.

". . . Destruction of other existing governments by violence is not the subject, merely, of a secret pact among Communists; it is the vaunted objective of the party openly declared by its recognized spokesmen."

All these pronouncements were made *prior* to the meeting of Bernard August with Dr. Hoyer on October 14, 1952, and the telephone conversation of October 22nd, so that it cannot be argued in behalf of August that he was unaware of the gravity of the charge of having been a member of the Communist Party and that, therefore, he could not know how important it was that Dr. Hoyer question him on his Communist affiliations.

In view of these above-mentioned authoritative pronouncements on the seriousness of Communist activity, August owed a bounden duty to his administrative superior in the Philadelphia school system to work with him in his investigation of Communist infiltration into that school system. Instead of lending his services to the Superintendent, he turned his back on the investigation. His flat refusal to assist Dr. Hoyer in obtaining information on matters peculiarly within his own knowledge amounted to insubordination as well as lack of frankness, candor and intellectual honesty which added up to incompetence.

However, aside from August's knowledge in 1952 of what the Communist Party stood for, he knew even before he joined the Communist Party that it was a fang in the jaws of the dragon of the worldwide Communist criminal conspiracy to destroy democratic government in the United States.

In his testimony before the school board, August said that he joined the Communist Party in 1942 and left it in 1950. Long prior to 1942 he, as an educated and reasonably informed man could not be ignorant of the subversive program of the Communists in the United States.

As early as 1928, the notoriously outstanding and unlamented late leader of the Communists in the United States, William Z. Foster, declared from red-festooned platforms throughout the country: "When a Communist heads a government in the United States, and that day will come just as surely as the sun rises, that government will not be a capitalistic government, but a Soviet government, and behind this government will stand the Red Army to enforce the dictatorship of the proletariat."[1]

As early as 1930, the United States House of Representatives conducted a thorough investigation, with extended hearings, on Communism in the United States. On January 17, 1931, the Committee of the whole House reported that Communists advocate:

"Hatred of God and all forms of religion."

"Destruction of private property, and inheritance."

"Revolutionary propaganda through the Communist International stirring up Communist activities in foreign countries in order to cause strikes, riots, sabotage, bloodshed, and civil war."

"Destruction of all forms of representative or democratic governments, including civil liberties, such as freedom of speech, of the press, of assembly, and trial by jury."

There must be utterly excluded any possibility, unless it be decided that Bernard August is wholly devoid of intelligence and is a babbling moron, that he was

---

[1] While Foster lay ill in a Moscow hospital whither he had traveled because he said that the Soviet hospitals were better than the American ones, Khrushchev honored him, and perhaps hastened his death, by visiting him at his bedside.

not fully informed of the conspiratorial and revolutionary character of the Communist Party at the time he joined it and remained within its ranks. At the hearing in the *Albert* case, supra, there was placed in evidence a sample membership card of the Communist Party which set forth the rights and duties of Party members as follows: " ' To attend club meetings, *read the Party press and literature,* pay dues regularly and be active on behalf of the program and policies of the Party. To participate in working out all policies and tasks of the club and to regularly examine the execution of such policies. To strive to master the program and policies of the Party, the principles of Marxism-Leninism.' " (Emphasis supplied.)

In reading the "party press and literature" August perforce read and perhaps memorized the Communist Manifesto which vividly and belligerently trumpets its battle cry of revolution and bloodshed: "The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. Let the ruling classes tremble at a Communist revolution."

The Communist Manifesto was published in 1848, ninety-four years before August became a member of the Communist Party, so that its exhortation to violence was common knowledge long before August vowed allegiance to the red flag and the hammer and the sickle.

But, aside from what August learned through his studies of Communist literature and fraternizing with Communists for eight years, he was thoroughly aware when he joined the Communist Party that he was defying the law of the Commonwealth of Pennsylvania, his employer, and to which he had pledged allegiance.

The Act of July 28, 1941, P. L. 530, forbade the employment in any capacity, by any agency or the Commonwealth or any county, city, borough, township or

school district, of any person who advocated or participated "by an overt act or acts in un-American or subversive doctrines." Any person so employed was to be dismissed in the same manner as provided by law for dismissals for other causes.

The School Code of 1949, in reenacting this provision, omitted the words "by an overt act or acts," thus obviously demanding a more rigorous standard of loyalty in respect to teachers than for other public employees.

The Act of 1941 gave a general definition of the phrase "un-American or subversive doctrines" as "doctrines which teach or advocate the overthrow of the government of the United States or of the Commonwealth of Pennsylvania by revolution or the changing of the form of government of the United States or of the government of Pennsylvania by means not provided for in the Constitution of the United States or the Constitution of the Commonwealth of Pennsylvania."

Thus, from 1942 to 1950, August was an active member of an organization which taught and advocated the overthrow of State and National governments by unconstitutional methods. He, of course, kept his Communist membership a secret from his employer. Had that membership been disclosed, he would have been subject to immediate dismissal, as Dorothy Albert was dismissed. Thus, for eight years, August wore the mask of deception, appearing to be a law-abiding citizen when in fact he was not. For eight years he wore a cloak of fraud, appearing before the school children of Philadelphia as a person whose conduct and behavior could be emulated as manifesting the highest type of citizenship, whereas, in fact, he was working with others to destroy that school system which he had pledged and sworn to uphold.

This deception is not extraordinary because Communists are instructed through Lenin's teachings that

"it is necessary . . . to resort to all sorts of devices, maneuvers, and illegal methods, to evasion and subterfuge."[2]

For eight years August practiced his deception, looking toward the day when, under the Communist revolution in the United States, according to William Z. Foster: "The studies will be revolutionized, being cleansed of religious, patriotic, and other features of the bourgeois ideology. The students will be taught on the basis of Marxian dialectical materialism, internationalism, and the general ethics of the new Socialist Society."[3]

August testified before the School Board that he never attempted to teach Communism to his pupils. But this is a self-serving statement. The *Communist* magazine of May, 1937, reminded its teachers: "Communist teachers are, therefore, faced with a tremendous social responsibility . . . They must take advantage of their positions without exposing themselves . . . Only when teachers have really mastered Marxism-Leninism will they be able skillfully to inject it into their teaching at the least risk of exposure."

Dr. Bella Dodd, former Communist teacher and state legislative director of the Communist Party in New York, testified at a House Committee hearing: "The Communist teacher is very clever at putting over the Communist ideology. You'd be surprised at how some of the great heroes of America have been perverted in the interests of Communism." When she was asked by committee counsel if she felt she had influenced students along the Communist line, she replied: "I would have been a very poor Communist if I didn't."[4]

---

[2] U. S. Govt. Printing Office, Committee Print, 84th Cong. 1st Sess. December 21, 1955, p. 13.

[3] Hearings, House Un-American Activities Committee, Hearings Feb. 25, 27, 1953, p. 30.

[4] Philadelphia Bulletin, November 25, 1953.

This recital of Communist history, methods and procedure is presented not for the purpose of establishing that August's dismissal was justified on the basis that he was a Communist, but to show that he was aware of what the Communist Party, of which he was an active member, was doing, and that he owed to his administrative superior the duty to divulge the information he possessed about the Communist Party, especially in connection with himself. His refusal to do so constituted, as already stated, "insubordination and lack of frankness, candor and intellectual honesty."

His intellectual dishonesty was established quite decisively not only by his attitude toward Dr. Hoyer but in his appearance before the School Board. Despite the Himalayan pile of documentary evidence to the contrary he testified that while he was a member of the Communist Party it was "a legal political party in the United States and the Commonwealth of Pennsylvania." He said further that while he was a member of the Communist Party, the Communist Party appeared "on the official state ballot of Pennsylvania." This is a total falsehood.

Section 801 of the Act of July 28, 1941, P. L. 526, provides, inter alia: ". . . the words 'political party' and the words 'political body', as hereinabove defined, shall not include any political party, political organization or political body composed of a group of electors, whose purposes or aims, or one of whose purposes or aims, is the establishment, control, conduct, seizure or overthrow of the Government of the Commonwealth of Pennsylvania or the United States of America by the use of force, violence, military measures, or threats of one or more of the foregoing."

Section 976 provides, inter alia: ". . . no nomination petition, nomination paper or nomination certificate shall be permitted to be filed, if the political party or political body referred to therein shall be com-

posed of a group of electors whose purposes or aims, or one of whose purposes or aims, is the establishment, control, conduct, seizure or overthrow of the Government of the Commonwealth of Pennsylvania or the United States of America by the use of force, violence, military measure or threats of one or more of the foregoing."

The Communist Party has not appeared on the state ballot in Pennsylvania since 1940.

August endeavored to convey the impression that during the whole time he belonged to the Communist Party it participated in no illegal activity. He said that he did not leave the party because of any conviction it was part of any conspiracy. His whole attitude was that the school authorities were in the wrong, and not he, because of the events of which he was the principal character. When he was asked by counsel for the School Board: "Who got you into the Communist Party?" he refused to answer the question and then said that his name had been put through a "smearing." And then, in self-justification, he added: "I did nothing to bring this upon myself that I consider in any way a disgraceful act."

He still refused to acknowledge that there was any turpitude involved in his being a member, for eight years, of an organization working against the welfare, the interests, the ideals and perhaps even the survival of the American people. It was during the years that August was a member of the Communist Party that it perpetrated many of its most perfidious deeds.

During this period the Communists stole the secret of the atomic bomb from American laboratories and turned it over to Russia; Alger Hiss and other traitors bartered government secrets to the Soviet Union; Communists penetrated into the State Department, Justice Department, the Armed Forces; they took over many labor unions employing workmen engaged in building

submarines, radars, electric machinery, all vital to the nation's defense; they polluted many of the literary, artistic, radio and cinematic streams for Soviet propagandistic purposes. Internationally (and the Communist Party of the United States is an integral part of the world-wide communist conspiracy) the Communists perpetrated aggressions against many unoffending and helpless nations; they illegally seized lands and countries; they enslaved peoples in all their vast domains; they eventually acquired a total of one-fourth of the earth's land surface and one-third of its population. It was during those eight years when August could see no wrong in the Communist Party in Philadelphia of which he was a financial secretary, that his Communist comrades in Europe were shooting down and killing unarmed American flyers, imprisoning other American flyers and, by establishing a blockade of Berlin, bringing about the death of still more American flyers.

The Communist Party in the United States, of which August was a part, approved and supported these outrages.

It would not be an illogical conclusion that when August was questioned by Dr. Hoyer he still believed in the Communist cause since he refused to give information which would help Dr. Hoyer to ferret out other Communists in the school system. He declined to assist the authorities in locating the Communist teachers who were still in a position to poison the very fountain of learning at which the school children of Philadelphia drank.

The lower court states that August is entitled to locus poenitentiae. It would seem that the court interprets this phrase to mean a pardon, which, of course, it does not. Locus poenitentiae literally means a place of repentance, but generally it is used to indicate an opportunity to undo what has been done. Black's

Law Dictionary defines the phrase as "a chance afforded to a person, by the circumstances, of relinquishing the intention which he has formed to commit a crime, before the perpetration thereof." But August's offense has already been committed, so that there is no way for him to relinquish the intention of doing what is a fait accompli.

Bouvier's Law Dictionary defines locus poenitentiae as: "The opportunity of withdrawing from a projected contract, before the parties are finally bound; or of abandoning the intention of committing a crime, before it has been completed."

August's offense was completed when he refused to show candor and intellectual honesty in dealing with his superior, Dr. Hoyer. August acted improperly for eight years and then when he was politely asked by his superior to tell about those eight years he charged Dr. Hoyer with being un-American and unfair! How can a school system be operated with any degree of efficiency, order and success if school teachers do not show respect toward the Superintendent of the school, the man who has the responsibility of maintaining order? How can children be expected to show respect toward their teachers if they learn that the teachers themselves are disrespectful to *their* superiors? Communists are always questioning the motives, the sincerity and the actions of government officers—whether in legislative, judicial or executive departments—but when they, in turn, are questioned they protest that their rights are being infringed upon, and that their liberties (which they deny to others) are being usurped.

The lower court seems to be of the belief that it is enough for an offending teacher to express regret and the damage which has been done by his offense will be repaired. No one can gainsay that mercy is a virtue and forgiveness is divine, but it is not within the province of the Court of Common Pleas to act as a celestial

Pardon Board. It would be extremely dangerous to countenance a practice which would allow a teacher to ignore the superintendent, flout his orders, defy his directions and spurn his authority, assured that if nothing untoward happens to the teacher he has gained everything, and if, on the other hand, he is charged with being contumacious and his job becomes endangered then he may call for a convening of the School Board (which means drawing from their respective offices, businesses, professions and other activities some score of persons) and tell them what he refused to tell the Superintendent.

The Philadelphia school system employs eight thousand teachers. The chaos which would follow the approval of such a practice is appalling to contemplate. No large organization can survive without orderly procedure and gradation of responsibility. Discipline is required not only in the military. It is indispensable in every establishment in civilization if anarchy and catastrophe are to be avoided.

What would happen in the transportation world (particularly the airlines and the railroads) if subordinate employees could freely refuse to carry out orders, the execution of which means the safety of countless lives? What shambles would occur in hospitals if nurses and attendants could refuse to obey the directions and prescriptions of surgeons and doctors? What would happen to all organized society if government employees could close their eyes to directives which control the intermeshing of the vast complicated gears of governmental machinery?

The lower court says that locus poenitentiae *is* (emphasis in court's opinion) present in this case because ". . . Mr. August sent a letter through his attorney to the School Board on December 16, 1953, offering to answer all questions that might be put to him by the School Board or its counsel."

It is difficult to understand how the court sees any penitence in this maneuver on the part of "Mr. August." There is scarcely a criminal who, upon being caught and facing certain conviction, does not want to undo what he did, so as not to undergo the penalty which exceeds the gain he thought he might have achieved. And then, the court makes no mention of the startling chronology in this matter of the letter. When it was sent, August had already been suspended and charges of incompetency had been filed. *Fourteen months* had expired since the date of his offense. In all this time he never attempted to supply Dr. Hoyer with the information which had been requested of him.

It is perfectly obvious that August's assumed penitence was a sham and a pretense. One who truly sorrows for having burnt down his neighbor's house does not wait until the neighbors have been made ill from exposure to rain, storm, snow and ice before he takes tools and timber to rebuild what he destroyed. Even so, August could not rebuild with a few drops of ink the house of character which he had himself brought down in ruins by turning his back on his administrative superior when that superior, with good intention and kind words, asked him to take the superior into his confidence.

And then, as a grotesque sequel to a grotesque counterfeit show of remorse, it is to be noted that the letter was not written by August but by his lawyer and the letter never even reached the School Board because it was mis-addressed!

Even if the court of common pleas had the power to save Bernard August from the dismissal ordered by the School Board on its mistaken concept of locus poenitentiae, an exercise of such power could not be sustained because the record would not support it. It is not a simple matter for one to betray his government and his fellow-countrymen for eight years, then arro-

gantly to defy authority when called to account, then to accuse the offended party with "smearing" tactics, and then for the guilty person to expect to be restored to a position of trust which involves the teaching of children, the future citizens of America, on the strength of the writing of a misdirected, impenitent letter which, tortoise-like, takes fourteen months in its preparation, and then finally sets off in the wrong direction to an incorrect destination. The offense committed by August and written large on the blackboard of his school, cannot be wiped away with so blundering, insincere and misdirected an eraser.

The record in the case overwhelmingly establishes, with a plethora of fact and law, that the Superintendent was not only warranted but compelled by law to suspend Bernard August as a result of his conduct, the School Board was warranted in dismissing him because of that misconduct, and the Superintendent of Public Instruction was equally warranted in law in affirming the action of the School Board.

The order of the Court of Common Pleas No. 6 of Philadelphia County is, therefore, reversed, and the action of the Superintendent of Public Instruction in sustaining the dismissal of Bernard August as a professional employee, is affirmed.

———

CONCURRING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

I concur simply in the result reached by the majority of the Court, a result, in my opinion, required by *Board of Public Education v. Beilan,* 386 Pa. 82, 125 A. 2d 327, affirmed 357 U. S. 399, 2 L. Ed. 1414.

DISSENTING OPINION BY MR. JUSTICE COHEN:

Once again, as in *Board of Public Education v. Soler,* 406 Pa. 168, 176 A. 2d 653 (1961), a majority of this Court has misinterpreted the effect of *Board of Public Education v. Intille,* 401 Pa. 1, 163 A. 2d 420 (1960) and *Board of Public Education v. Watson,* 401 Pa. 62, 163 A. 2d 60 (1960), and has overlooked the basic distinction between an incompetency interview and a loyalty proceeding. In this case, moreover, my colleagues have compounded the error by broadening the meaning of "incompetency" even beyond the encompassing interpretation given that word in the recent *Soler* opinion.

The majority opinion in the present case indicates further misunderstanding of the laws of both the United States and the Commonwealth of Pennsylvania by suggesting that *Intille* and *Watson* in no way affected the interpretation given by this Court to "incompetency" in *Board of Public Education v. Beilan,* 386 Pa. 82, 125 A. 2d 327 (1956), affirmed 357 U. S. 399, 409, 2 L. Ed. 2d 1414, 1433, 78 S. Ct. 1317, 1324 (1958). In affirming *Beilan,* the U. S. Supreme Court held only that the interpretation of "incompetency" given by this Court "is not inconsistent with the Federal Constitution," (357 U. S. at 408). This decision in no way precluded our Court from changing the interpretation of "incompetency," as we did in *Intille* and *Watson.*

The majority here asserts that under the *Soler* decision, a teacher's refusal to answer questions asked by his administrative superior concerning his loyalty constitutes "incompetency" within the meaning of the Public School Code of March 10, 1949, P. L. 30, §1122 et seq., as amended, 24 PS §11-1122 et seq., and that the only issue involved herein is whether appellee's behavior fell within the judicial proscription. One need only glance at the lengthy opinion of the majority to realize that the real, indeed the sole, question in this

case concerns appellee's loyalty. If the majority is concerned only with incompetency, there is no relevancy in the detailed history of the Communist conspiracy in this country and abroad. Similarly, if incompetency is the only question involved, the majority's attack on the appellee for his affiliation with Communist organizations is unnecessary.

It is ironic that August's alleged incompetency does not arise out of his membership in Communist organizations. Indeed, he cannot be discharged for such membership under the Public School Code of 1949, but must be proceeded against in compliance with the Pennsylvania Loyalty (Pechan) Act of 1951, December 22, P. L. 1726, as amended, 65 PS §211 et seq. Notwithstanding, the majority holds, in defiance of logic, that appellee's mere refusal to answer his superior's questions concerning this membership, in and of itself, constitutes incompetency.

What, says the majority, is the difference between a refusal by a teacher to answer questions posed by an administrative superior concerning loyalty and questions concerning immoral or criminal behavior? Under the Pennsylvania statutes there is a very crucial distinction. Unquestionably, a teacher's refusal to answer his superior regarding alleged immoral or criminal activities would constitute insubordination and fall within the definition of incompetency under the Public School Code of 1949, 24 PS §11-1122. I agree thoroughly that a school board is entitled to candid answers from its employees and that it can terminate the employee's status on the ground of incompetency if such answers are not forthcoming. Since the Public School Code of 1949 does not provide a specific procedure to guide the administrative superior in questioning teachers regarding these matters, the professional interview is the proper—indeed, the only—place for the superior to obtain this information.

Concerning loyalty, however, the Legislature has established a detailed statutory procedure to assist the administrative officer to obtain necessary information under conditions safeguarding the teacher's interests. For this reason, questions regarding loyalty were excepted by the explicit provisions of the Pechan Act from the matters permitted to be raised in an incompetency interview. In this one area, therefore, the Public School Code of 1949 has been preempted by the Pechan Act.

The title of the Pechan Act states, "An act relating to the loyalty to the United States and the Commonwealth of Pennsylvania of public officers and employes, including teachers and other employes of the public school system . . .; prohibiting appointment or employment and requiring discharges after hearing in certain cases . . . ."

Moreover, Section 15 of the Act provides: *"Effect and Applicability of Act* . . . (a) The provisions of this act shall not affect the right to discharge *any person for any cause other than those provided for by this act* or without cause under existing law . . ." (65 PS §225) (Emphasis supplied)

The majority states that its interpretation of the Pechan Act will not render the law impotent and meaningless. It then attempts to justify August's dismissal, patently based on the substantive grounds of disloyalty without the corresponding safeguards of the Pechan Act, on the basis that the sole question raised at the interview was that of incompetency and that, consequently, the statutory requirements for a loyalty inquest were unnecessary and inapplicable. Such a position misconstrues the basic meanings of *loyalty* and *incompetency* and constitutes an indiscriminate interchanging of these very distinct words.

The Legislature in enacting the Pechan Act was well aware of the charged atmosphere in which the Act

was to be applied. Consequently, to be discharged under the Act, a person must be determined to be a "subversive person" by a "fair preponderance of the evidence." 65 P.S. §217. The difficulty which a School Board might have in meeting the rather rigorous burden imposed by the Act makes an incompetency interview a much more attractive forum in which to discuss the question of loyalty. This Court, in *Beilan, Soler* and the present case, approves this practice even though it is contrary to the provisions of the Pechan Act and though it destroys the distinctions between "loyalty" and "incompetency."

Here, however, the majority even goes beyond the interpretation of incompetency given in *Soler*. In this case, we never reached the step where the teacher refused to answer questions posed by the administrative superior. Appellee was discharged without the superintendent having actually asked him questions at an interview. The record is clear that an initial hearing was held in October, 1952. At that time no questions were asked, and the superintendent gave appellee permission to refer the matter to counsel. Subsequently, August phoned the superintendent and informed him that under advice of counsel, he would act as had other teachers accused of disloyalty and would not answer questions concerning this subject. No questions were asked during the conversation. Dr. Hoyer, the superintendent, never fixed a time for a second interview at which he could propound the questions he wished to ask. Appellee was justified in expecting an interview before he was suspended. Without holding an interview at which he actually posed questions concerning loyalty, the superintendent had no way of knowing whether appellee would actually refuse to answer. Indeed, at the hearing before the School Board, the first opportunity he had to appear before an official body, August did answer questions concerning his association with Communist organizations.

In effect, the majority is holding that an administrative superior can discharge a teacher on the grounds of incompetency if the superior has reason to believe that the teacher *will* refuse to answer questions in futuro. This is a most dangerous proposition. Although the present case concerns loyalty, the majority's position is equally as applicable in a situation concerning immoral or criminal activity. Consequently, a teacher accused of improper activity would be fired if he expresses reluctance to discuss the matter with his superior, even though the latter may never have questioned him formally concerning it.

Mere suspicion of refusal is not sufficient; there must be *an actual refusal to answer* to constitute incompetency, even within the wide interpretation given to that word by this Court. Human beings change their minds. A teacher must be given the opportunity at a scheduled interview to refuse to answer, and must be on notice that his refusal will constitute incompetency. Any other position does violence to the Due Process clauses of both the United States and Pennsylvania Constitutions.

It is not difficult to lodge an emotional diatribe, as the majority opinion does, against the Communist organization and its recognized conspiracy to conquer the world. When, however, we approve procedures which violate fundamental due process, despite the fact that the Legislature has provided an effective, direct and constitutionally sound alternative method for ridding ourselves of these undesirables, we lose all sense of law and order, and, indeed, play into the hands of the Communist conspiracy. It is just such a course that the majority opinion invites.

The majority opinion asks, "What would happen to all organized society if government employees could close their eyes to directives which control the intermeshing of the vast complicated gears of governmental

machinery?" There is an obvious answer to this query. If the procedures provided by the Pechan Act are utilized, such employes would be eliminated from the scene. There is, however, a second result, much more inimical to organized society, which the majority opinion does not consider: when, as happened here, government *officers* close their eyes to positive statutory directives, and, without any evidence, impose sanctions, due process is denied and the very fibre of our democratic government is weakened.